(Slip Opinion) OCTOBER TERM, 2025 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* SLAUGHTER

### CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 25–332.  Argued December 8, 2025—Decided June 29, 2026

The Federal Trade Commission (FTC) is a regulatory agency that has accumulated vast rulemaking, enforcement, and adjudicatory powers. The FTC's powers belong not to the President or his appointees alone, but instead to five Commissioners, each of whom serves for seven years and may be removed by the President only "for inefficiency, neglect of duty, or malfeasance in office."  15 U. S. C. §41.

Soon after President Trump began his second term in January 2025, he fired the FTC's two Democratic appointees, Rebecca Slaughter and Alvaro Bedoya. He did not identify a cause under the statute. He instead told them their "continued service on the FTC [was] inconsistent with [his] Administration's priorities" and that they were removed "pursuant to [his] authority under Article II of the Constitution."  App. 28. Slaughter filed suit against the President and other executive officials, seeking relief to restore her to office. She argued that her removal was ultra vires, violated the Administrative Procedure Act, and violated the Constitution. The District Court granted Slaughter's motion for summary judgment. It acknowledged that *Myers* v. *United States,* 272 U. S. 52, generally permits the President to remove executive officers at will, but explained that *Humphrey's Executor* v. *United States,* 295 U. S. 602, carved out an exception for the FTC. The court declared the President's "purported removal" ultra vires and issued a permanent injunction barring interference "with Ms. Slaughter's right to perform her lawful duties."  App. 90–91. A divided Court of Appeals denied the Government's motion for a stay pending appeal, and this Court stayed the District Court's order and granted certiorari before judgment.

*Held*: The FTC's for-cause removal provision is contrary to the

separation of powers enshrined in the Constitution. Pp. 2–36.

(a) The Constitution vests "[t]he executive Power" in a "President of the United States of America" and instructs that he "take Care that the Laws be faithfully executed." Art. II, §§1, 3. To vest the executive power in one person was to establish a hierarchy—a "Chief Magistrate" with whom the buck stops, and below him various "assistants or deputies" who "derive their offices from his appointment" and remain "subject to his superintendence." The Federalist No. 72, p. 436 (A. Hamilton). To remain accountable to the President, those officers must be removable by the President. Pp. 4–13.

(1) The idea that one President would be in charge was by no means a foregone conclusion in 1787. The flurry of state constitutions that followed the Declaration of Independence "made of the gubernatorial magistrate a new kind of creature, a very pale reflection indeed of his regal ancestor." G. Wood, The Creation of the American Republic, 1776–1787, p. 136. Almost every State had but a nominal Governor, who could act only with his council's consent. These early chief executives were "little more than chairmen of their executive boards." *Id.*, at 138.

The Framers chose to depart from this model, for they had seen its flaws up close. For "fear" of "monarchical . . . power," William Livingston lamented, the States "improvidently" had devised executives "too weak & ineffacatious to operate with proper energy & vigour." 5 Papers of William Livingston 56–57 (C. Prince, M. Lustig, & D. Vorhees eds.). Thus when delegates at the Constitutional Convention objected to "unity in the Executive magistracy" as "the foetus of monarchy," 1 Records of the Federal Convention of 1787, p. 66 (M. Farrand ed.) (E. Randolph), others replied that the concern was quite backward. "[I]nstead of being the fetus of Monarchy," they explained, "[u]nity in the Executive" was "the best safeguard against" it—for only a "single Person" could produce the "vigor and activity" necessary to preserve the Constitution's separation of powers. *Id.*, at 66, 109 (J. Wilson).

In opting for one President, however, the Framers did not opt for the President to work alone. They knew that Congress would "institut[e] the great Departments" and allow the President to "appoint[] officers therein, to assist [him] in discharging the duties of his trust." 30 Writings of George Washington 334 (J. Fitzpatrick ed.). These officers were to serve as envoys of the President, not his equals. They "ought to be considered as the assistants or deputies of the Chief Magistrate," Hamilton explained, "and on this account, they ought to derive their offices from his appointment, at least from his nomination, and ought to be subject to his superintendence." The Federalist No. 72, at 436.

Because these officers were subject to the President's superintendence, they had to be removable by him at will. The power to remove at

will was a necessary corollary of the Constitution's design. The "unity" of the Executive Branch would be "destroyed" if it were vested "ostensibly in one man, subject in whole or in part to the control and co-operation of others, in the capacity of counselors to him." *Id.*, No. 70, at 424 (A. Hamilton). Text and structure thus both taught that the President had to be able to remove those who fail to live up to their duties, lest he fail to live up to his.

(2) This aspect of the President's role was confirmed in the Constitution's first year and the years that followed, resulting in a "regular course of practice" that "liquidate[d] & settle[d]" the President's power of removal. 8 Writings of James Madison 450 (G. Hunt ed.).

When the First Congress met in 1789, one of its first tasks was to establish the first executive departments—and with them the first department heads. Under the Constitution, those officers had to be appointed by the President, with the "Advice and Consent" of the Senate. Art. II, §2, cl. 2. The question before Congress was how those officers were to be removed. Madison contended that removal was part of "the Executive power" vested in the President, which "the Legislature has no right to diminish or modify." 1 Annals of Cong. 463. It is only with that power, he explained, that "the chain of dependence [can] be preserved"—"the lowest officers, the middle grade, and the highest" made to "depend, as they ought, on the President, and the President on the community." *Id.*, at 499.

Madison emerged victorious, and Congress's confirmation of the President's power gained fame as "the Decision of 1789." Chief Justice Marshall described the decision as "a full expression of the sense of the legislature," 5 J. Marshall, The Life of George Washington 199–200, and early Presidents of all persuasions agreed. Pp. 9–13.

(b) What text, history, and structure settle, the Court's precedent confirms—the President may remove his subordinates at will. Pp. 13–25.

(1) As early as 1839, the Court reaffirmed what the First Congress had held. It was "very early adopted, as the practical construction of the Constitution," the Court noted, that the power "to remove, where the tenure of the office was not fixed by the Constitution," was "vested in the President alone." *Ex parte Hennen*, 13 Pet. 230, 259. See also *Parsons* v. *United States*, 167 U. S. 324, 330 ("[T]he decision of Congress in 1789, and the universal practice of the Government under it, ha[s] settled the question beyond any power of alteration").

The Court's landmark decision in *Myers* v. *United States*, 272 U. S. 52, confirmed the President's power to fire his subordinates at will. The case arose when President Wilson fired Frank Myers—the postmaster in Portland, Oregon—without consulting the Senate, notwithstanding an 1876 statute that required the President to receive the

"advice and consent of the Senate" not only to *appoint* postmasters but also to *remove* them. §6, 19 Stat. 80. Writing for the Court, Chief Justice Taft noted that in the wake of the political differences following the Civil War between President Johnson—a Jacksonian Democrat— and congressional Republicans, Congress had sought to "curtail the then acknowledged powers of the President" with the Tenure of Office Act. *Myers*, 272 U. S., at 165–166. Under that law, the President was required to receive the Senate's consent before firing most officers. See *ibid*. "[T]he injury and invalidity" of the Act was "immediately recognized by the Executive and objected to"—and not just by President Johnson, but by General Grant who succeeded him. *Id.*, at 167. What these events revealed, Chief Justice Taft wrote, was a consistent Presidential rejection of "the validity of such legislation" as incompatible with "the legislative action of 1789." *Id.*, at 172–173.

The law concerning postmasters thus raised the question whether "to set aside" the First Congress's "construction, thus buttressed, and adopt an adverse view" contrary to the Constitution's text, history, and structure. *Id.*, at 175. The Court refused to do so, and instead hewed to the "constitutional construction . . . reached by the First Congress . . . and acquiesced in by the whole Government for three-quarters of a century." *Id.*, at 176. Pp. 13–16.

(2) Nine years after *Myers*, the Court decided *Humphrey's Executor* v. *United States*. Pp. 16–25.

(i) *Humphrey's* arose when President Roosevelt fired an FTC Commissioner without specifying a cause for his removal, contrary to a statute permitting removal only for "inefficiency, neglect of duty, or malfeasance in office." §1, 38 Stat. 718. The Court ruled against President Roosevelt, distinguishing *Myers* by explaining that some presidentially appointed officials may perform "executive function[s]" but exercise "no part of the executive power," 295 U. S., at 628, and holding that the FTC's duties were "neither political nor executive, but predominantly quasi-judicial and quasi-legislative," *id.*, at 624. Because these quasi functions did not require the use of "executive power," the Court reasoned, Humphrey needed to answer only to Congress and the courts. *Id.*, at 628. Pp. 16–18.

(ii) *Humphrey's* framework has not withstood the test of time. From the start, *Humphrey's* was tethered to a highly circumscribed view of the FTC's role. *Humphrey's* by its terms applied only to agencies that occupy "no place in the executive department," are "independent of executive authority," and exercise "no part of the executive power." *Id.*, at 625, 628. Indeed, the Court took pains to emphasize that "the character of the office"—executive or nonexecutive—would determine the result of future cases. *Id.*, at 631.

In later cases, the Court concluded that more functions fell on the

executive side of that line—and thus within the President's exclusive control.  Soon enough, the Court recognized that *Humphrey's* flunked even its own test.  "[I]t is hard to dispute that the powers of the FTC," even "at the time of *Humphrey's Executor*," the Court explained in 1988, "would at the present time be considered 'executive,' at least to some degree."  *Morrison* v. *Olson*, 487 U. S. 654, 690, n. 28.

In *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U. S. 477, and *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, the Court reiterated *Myers'*s rule that the President exercises "general administrative control of those executing the laws" and must be able to "remov[e] those for whom he can not continue to be responsible."  *Free Enterprise Fund*, 561 U. S., at 492–493 (quoting *Myers*, 272 U. S., at 117, 164); *Seila Law*, 591 U. S., at 214 (same).  And the Court refused to extend *Humphrey's* to "new situation[s]."  *Seila Law*, 591 U. S., at 220; see *Free Enterprise Fund*, 561 U. S., at 483.  At this point, all that is left of *Humphrey's* is its observation that an agency that "exercises no part of the executive power" need not fall within the rule of Presidential removal.  295 U. S., at 628.  Pp. 18–21.

(iii) If anything more is left of *Humphrey's*, the Court overrules it.  *Humphrey's* has for decades been a result in search of a rationale, and every relevant factor to *stare decisis*—the "quality" of the decision's reasoning, its "consistency" with the Court's other cases, the "workability" of its rule, and reliance interests, *Knick* v. *Township of Scott*, 588 U. S. 180, 203—counsels in favor of letting *Humphrey's* go.

Slaughter relies on reliance.  She argues that Congress has relied upon *Humphrey's* to create agencies that are "insulated from presidential control."  Brief for Respondent 15.  But that is precisely the problem.  Despite what *Humphrey's* may say, independent agencies are not "independent" in the sense that they are free of the President and thus responsive "only to the people of the United States."  295 U. S., at 625.  Placing the power to administer laws in officers who enjoy "freedom from Presidential oversight (and protection)" does not deliver us to a promised land of technocratic governance—it often results only in an "increased subservience to congressional direction."  *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 523 (plurality opinion).  Pp. 21–25.

(c) With these principles in mind, the FTC's for-cause removal provision violates the separation of powers.  In its present form, the FTC enforces and administers some 80 statutes covering almost every facet of the Nation's economy, and the tasks it undertakes are "the very essence of 'execution' of the law."  *Bowsher* v. *Synar*, 478 U. S. 714, 733.  The FTC has the power to promulgate substantive rules carrying the force of law, investigate businesses and enforce statutes through in-house adjudications, and file civil suits on behalf of the United States

in federal court. The FTC unquestionably exercises executive power
and must therefore be controlled by the Chief Executive. Pp. 25–27.

(d) Because the FTC's activities fall well within the heartland of ex-
ecutive power, the Court has no occasion today to define the bounds of
what such power entails. Not all offices created by Congress neces-
sarily come with executive power, see, *e.g.*, *Buckley* v. *Valeo*, 424 U. S.
1, 137–138 (*per curiam*), and the Court has left open the possibility
that some functions traditionally handled outside the Executive
Branch may not be encompassed by *Myers'*s general rule. One example
the Court has given of such an entity is the Federal Reserve, to the
extent that it follows in the tradition of the First and Second Banks of
the United States. See *Seila Law*, 591 U. S., at 222, n. 8. And as the
Government recognizes, the permissibility of tenure protections for
non-Article III courts is not presented or briefed in this case. The
Court leaves those questions for another day. All the Court does today
is recognize what has been clear for a century—that those who fall
within the President's "general administrative control" must be remov-
able by the President at will. *Myers*, 272 U. S., at 135. Pp. 27–28.

(e) Slaughter's counterarguments are rejected. She relies on
*Humphrey's* and *stare decisis*, but she does not defend *Humphrey's* on
its own terms. She does not argue that the FTC today occupies "no
place in the executive department" or exercises "no part of the execu-
tive power." 295 U. S., at 628. Her historical arguments regarding
early multimember agencies fail because the members of these agen-
cies, too, were removable by the President at will.

Slaughter ultimately proposes that the Court police Congress's deci-
sions in this area only for "reasonableness." She argues that Congress
may "reasonably" decide "that the President should be able to remove
some duly appointed officers only for certain causes and through cer-
tain processes." Brief for Respondent 25 (internal quotation marks
omitted). Slaughter's supposed limiting principle is neither limiting
nor much of a principle. On her view, Congress could commandeer the
Environmental Protection Agency, the Department of Commerce, the
Department of Education, the Department of Health and Human Ser-
vices, most (if not all) of the Department of Justice, and a number of
other agencies besides. Indeed, if Slaughter were correct, then it is not
clear why Congress would need to allow the President any say in fir-
ings at all.

Slaughter's view is incompatible with our constitutional design. Alt-
hough it is up to the Senate to decide whether to confirm those with
whom the President would *prefer* to work, neither Congress nor the

Syllabus

courts may saddle him with those with whom he *cannot* work. Subordinates who exercise the President's power are subject to removal by him. Then, and only then, can they remain accountable to the President, and the President to the people. Pp. 28–36.

Reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined, and in which THOMAS, J., joined as to all but Part III–B. GORSUCH, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 25–332

―――――――

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* REBECCA KELLY SLAUGHTER

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2026]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Nearly 250 years ago, the Framers decided to vest "[t]he executive Power" in one person—"a President of the United States of America." Art. II, §1, cl. 1. The choice was not made lightly. Within living memory were the "long train of abuses and usurpations" of a King who reigned as "a Tyrant." Declaration of Independence ¶¶2, 30. Indeed, several delegates to the Constitutional Convention pushed for a multimember council instead of "unity in the Executive magistracy," which they feared would serve as "the foetus of monarchy." 1 Records of the Federal Convention of 1787, p. 66 (M. Farrand ed. 1911) (Farrand's Records) (E. Randolph). But unity won out. Our Constitution's drafters knew from experience that a "plurality in the executive"—the model in use by most States at the time—not only "diminishe[s]" the "activity, secrecy, and dispatch" necessary to ensure "good government" but "tends to conceal faults and destroy responsibility." The Federalist No. 70, pp. 423–424, 427 (C. Rossiter ed. 1961) (A. Hamilton). With just one

President in charge, they reasoned, there would be no doubt "on whom the blame or the punishment of a pernicious measure . . . ought really to fall." *Id.*, at 428.

One hundred years ago, this Court honored the Convention's choice in the seminal case of *Myers* v. *United States*, 272 U. S. 52 (1926). There, we held that the Constitution "grants to the President" the "general administrative control of those executing the laws, including the power of appointment and removal of executive officers." *Id.*, at 163–164. Because no one could "execute the laws" "alone and unaided," Chief Justice Taft explained for the Court, the President must be permitted to "select those who . . . act for him" and "remov[e] those for whom he can not continue to be responsible." *Id.*, at 117. "[T]o hold otherwise would make it impossible for the President" to fulfill his constitutional obligation "to take care that the laws be faithfully executed." *Id.*, at 164.

Today we confront one of several regulatory agencies that deviate from this model of Presidential supervision—the Federal Trade Commission (FTC). Since its creation in 1914, the FTC has accumulated vast rulemaking, enforcement, and adjudicatory powers under more than 80 statutes. Not only does it promulgate rules that carry the force of law, but it also enforces those rules against private parties, collecting civil penalties in the billions of dollars. Its powers, however, do not belong to the President or his appointees alone; they instead belong to five Commissioners, each of whom serves for seven years and may be removed by the President only "for inefficiency, neglect of duty, or malfeasance in office." 38 Stat. 718, 15 U. S. C. §41.

We hold that such protection from removal is contrary to the separation of powers enshrined in the Constitution.

## I

When President Trump began his second term in January 2025, the FTC was led by two Republicans and three

Democrats. On his first day in office, he designated a new Chair, replacing President Biden's pick. See 15 U. S. C. §41 (permitting the President to choose a Chair "from the Commission's membership"). As is customary, the former Chair, Lina Khan, resigned her seat a few weeks later, permitting President Trump to appoint a replacement (contingent, of course, on the Senate's advice and consent). In the meantime, however, the FTC would be split down the middle.

That split came to an abrupt end in March, when President Trump fired the two remaining Democratic Commissioners, Rebecca Slaughter and Alvaro Bedoya. He did not assert that they were "inefficien[t]," "neglect[ed]" their "dut[ies]," or committed "malfeasance in office," as the statute required. §41. He instead told them that their "continued service on the FTC [was] inconsistent with [his] Administration's priorities" and that they were removed from office "pursuant to [his] authority under Article II of the Constitution." App. 28.

Slaughter promptly filed suit against the President and other executive officials, seeking declaratory and injunctive relief to restore her to office.[1] She alleged that her removal was ultra vires, violated the Administrative Procedure Act, and violated the Constitution.

The District Court agreed, granting Slaughter's motion for summary judgment. 791 F. Supp. 3d 1 (DC 2025). It acknowledged that *Myers* generally permits the President to remove "executive officers" at will, as part of his "general administrative control of those executing the laws." 791 F. Supp. 3d, at 11 (quoting *Myers*, 272 U. S., at 164). But it considered itself bound by *Humphrey's Executor* v. *United*

---

[1] Slaughter was initially joined in her lawsuit by Bedoya, who similarly sought to be restored to office. After litigation commenced, however, Bedoya formally resigned from his position on the FTC, and the District Court dismissed his claims as moot. Thus only Slaughter's claims are at issue here.

*States*, 295 U. S. 602 (1935). That case, the District Court explained, carved out an exception to *Myers*'s general rule for the FTC, which the *Humphrey's* Court described as a multimember "expert" agency that exercised solely "quasi-legislative" and "quasi-judicial" functions. 791 F. Supp. 3d, at 13, 17–18. The court declared the President's "purported removal" ultra vires and issued a permanent injunction barring interference "with Ms. Slaughter's right to perform her lawful duties." App. 90–91.

A divided Court of Appeals denied the Government's motion for a stay pending appeal. 2025 WL 2551247 (CADC, Sept. 2, 2025) (*per curiam*). The panel held that the Government has "no prospect of success on appeal," as this very issue had been settled by *Humphrey's Executor*. 2025 WL 2551247, *3. Judge Rao dissented, explaining that *Humphrey's Executor* does not license a "headless fourth branch" of independent agencies exercising "considerable executive power." 2025 WL 2551247, *13 (quoting *Trump* v. *Wilcox*, 605 U. S. ___, ___ (2025) (slip op., at 1)).

We stayed the District Court's order and granted certiorari before judgment. 606 U. S. 1051 (2025).

## II

### A

The Constitution vests "[t]he executive Power" in a "President of the United States of America" and instructs that he "take Care that the Laws be faithfully executed." Art. II, §§1, 3. To vest "the whole executive power" in just one person was not to suggest that he could execute the laws alone and unaided. The Federalist No. 47, at 303 (J. Madison). But it was to establish a hierarchy—a "Chief Magistrate" with whom the buck stops, and below him various "assistants or deputies" who "derive their offices from his appointment" and remain "subject to his superintendence." *Id.*, No. 72, at 436 (A. Hamilton). To remain accountable to

the President, those officers must be removable by the President.

1

The idea that one President would be in charge was by no means a foregone conclusion in 1787. Just ten years earlier, the colonists had "thrown off the Yoke" of King George III and his colonial governors, 5 Papers of John Adams 26 (R. Taylor ed. 1983) (S. Adams), who had laid a "[f]oundation sufficient on which to erect a Tyranny," J. Adams, Diary and Autobiography of John Adams 260 (L. Butterfield ed. 1961). Now citizens, they had no intention of reestablishing "the kingly office" by another name. 1 Papers of Thomas Jefferson 337 (J. Boyd ed. 1950). Thus the flurry of state constitutions that followed the Declaration of Independence "made of the gubernatorial magistrate a new kind of creature, a very pale reflection indeed of his regal ancestor." G. Wood, The Creation of the American Republic, 1776–1787, p. 136 (1998) (Wood); see also J. Rakove, Original Meanings 250–252 (1996). Almost every State had but a nominal Governor, who could act only with his council's consent. These early chief executives were "little more than chairmen of their executive boards." Wood 138.

The Framers chose to depart from this model, for they had seen its flaws up close. Common was the complaint that the States' feeble and divided executives left no "effectual check" for "the instability & encroachments" of legislatures. See 2 Farrand's Records 35 (J. Madison). For "fear" of "monarchical . . . power," William Livingston lamented, the States "improvidently" devised executives "too weak & inefficatious to operate with proper energy & vigour." 5 Papers of William Livingston 56–57 (C. Prince, M. Lustig, & D. Vorhees eds. 1988).

The Convention was determined not to make the same mistake. See Wood 467. So when delegates objected to "unity in the Executive magistracy" as "the foetus of

monarchy," 1 Farrand's Records 66 (E. Randolph), others could soundly reply that the concern was quite backward. "[I]nstead of being the fetus of Monarchy," they explained, "[u]nity in the Executive" was "the best safeguard against" it—for only a "single Person" could produce the "vigor and activity" necessary to preserve the Constitution's separation of powers, and only a "single Person" could make the office "responsibl[e]" to the people. *Id.*, at 66, 109 (J. Wilson). "Give him an able Council and it will thwart him; a weak one and he will shelter himself under their sanction." 2 *id.*, at 329 (C. Pinckney). Any more than one person in charge, as James Wilson put it, "oftener serves to cover, than prevent malpractices." 1 *id.*, at 97.

That the Constitution forged a new path was not hidden from those who ratified it. Hamilton frankly conceded that only two States thus far "have intrusted the executive authority wholly to single men," The Federalist No. 70, at 424, anticipating Roger Sherman's critique of the Constitution that every other government has "a Council of advice, without which the first magistrate could not act," 1 Farrand's Records 97. To Hamilton, however, that was the point. Unlike most States, the Federal Government would have "a vigorous executive" who could act with "secrecy . . . and dispatch"—and would not be able to "conceal [his] faults" behind a council. The Federalist No. 70, at 423–424, 427. "[A] plurality in the executive," Hamilton argued, "tends to conceal faults and destroy responsibility." *Id.*, at 427. "It often becomes impossible, amidst mutual accusations, to determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures, ought really to fall." *Id.*, at 428. If the executive power were not placed in a "single hand," then "the people" would be "deprive[d] . . . of the two greatest securities they can have for the faithful exercise of any delegated power"—"the restraints of public opinion" and the "opportunity of discovering with facility

and clearness the misconduct of the persons they trust." *Id.*, at 424, 428–429.

In opting for one President, however, the Framers did not opt for the President to work alone.  They knew (as our first President would write) that it would be "impossib[le]" for just "one man . . . to perform all the great business of the State."  30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939).  So they anticipated that Congress would "institut[e] the great Departments" and allow the President to "appoint[] officers therein, to assist [him] in discharging the duties of his trust."  *Ibid.*  As James Wilson explained at the Convention, "there can be no good Executive without a responsible appointment of officers to execute."  2 Farrand's Records 538–539.

These officers were to serve as envoys of the President, not his equals.  Their very purpose, after all, was to assist him "to discharge *his* arduous employment," not *theirs*.  4 Debates on the Constitution 109 (J. Elliot 2d ed. 1891) (J. Iredell) (emphasis added).  As such, the Government's "ministers" were required to "exercise their functions in subordination to the Executive," whether their tasks were big or small.  2 Farrand's Records 54 (G. Morris).  Hamilton made the same point.  "The persons . . . to whose immediate management" the President's powers "are committed, ought to be considered as the assistants or deputies of the Chief Magistrate, and on this account, they ought to derive their offices from his appointment, at least from his nomination, and ought to be subject to his superintendence."  The Federalist No. 72, at 436.  In so structuring the Government, the Convention "rejected a committee-style Executive Branch in favor of a unitary and accountable President, standing under law, yet over" his department heads.  A. Amar, Some Opinions on the Opinion Clause, 82 Va. L. Rev. 647 (1996).  It helped in reaching that conclusion, of course, that everyone at the Convention knew who that President would be—the Convention's presiding officer, George

Washington.  See J. Flexner, George Washington and the
New Nation: 1783–1793, pp. 133–134 (1970).[2]

Because these officers were subject to the President's su-
perintendence, they had to be removable by him at will.  For
one, that was just part of what it meant to wield "the exec-
utive power," as it was understood at the time of ratifica-
tion.  Jefferson wrote as early as 1780 that "[t]he power of
appointing and removing executive officers [is] inherent in
[the] Executive," as "[h]e who appoints may remove."  4 Pa-
pers of Thomas Jefferson 281 (1951).  And as to this power,
the Constitution's words were chosen carefully—it was the
President who would "appoint" the principal "Officers of the
United States," with the Senate providing "Advice and Con-
sent."  Art. II, §2, cl. 2; cf. The Federalist No. 66, at 404 (A.
Hamilton) ("[I]n all the governments with which we are ac-
quainted . . . those who hold offices during pleasure [are]
dependent on the pleasure of those who appoint them").  If
the Framers intended to depart from this convention, one
might have expected them to say so.

For another, the power to remove at will was a necessary
corollary of the Constitution's design.  The "unity" of the

───────────

[2] Indeed, Washington himself was known to favor a capable, vigorous,
and unified Executive Branch.  See G. Phelps, George Washington and
American Constitutionalism 56, 142–145 (1993).  Throughout the Revo-
lutionary War, he had complained about the "vital and inherent Princi-
ple of Delay . . . in transacting Business" through the Continental Con-
gress's multimember executive committees, 3 Writings of George
Washington 12 (W. Ford ed. 1889), which he felt led to "unpunishable
Neglect of Duty," *id.*, at 34.  Even in peacetime, he saw the Confederation
Congress as "not only slow, debilitated, and liable to be thwarted by
every breath, but . . . defective in that secrecy, which for the accomplish-
ment of many of the most important national purposes is indispensably
necessary."  29 *id.*, at 153 (J. Fitzpatrick ed. 1939).  It is little wonder
then, that the Convention created a powerful Presidency, one fit for
Washington.  As South Carolina delegate Pierce Butler put it, the Con-
vention's members "cast their eyes towards General Washington as Pres-
ident; and shaped their Ideas of the Powers to be given to a President, by
their opinions of his Virtue."  3 Farrand's Records 301–302.

Executive Branch would be "destroyed," Hamilton wrote, if it were vested "ostensibly in one man, subject in whole or in part to the control and co-operation of others, in the capacity of counselors to him." *Id.*, No. 70, at 424. But that is precisely what would occur if the President's so-called assistants could exercise *his* power against *his* wishes. Only if the President's deputies were removable at will would they truly be "subordinate" to "the sole executive magistrate." See *id.*, No. 47, at 303 (J. Madison). And only then could the Constitution live up to James Iredell's boast that "the President" would "be *personally responsible* for everything." Answers to Mr. Mason's Objections to the New Constitution (1788), in Pamphlets on the Constitution of the United States 348 (P. Ford ed. 1888); see also 1 Writings of James Monroe 331 (S. Hamilton ed. 1898) ("I would repose the whole trust of this department in one officer, so he alone should be responsible for all its transactions"). Text and structure thus both taught that the President had to be able to remove those who fail to live up to their duties, lest he fail to live up to his.

2

This aspect of the President's role was confirmed in the Constitution's first year—and in the years that followed. The result was a "regular course of practice" that "liquidate[d] & settle[d]" the President's power of removal, 8 Writings of James Madison 450 (G. Hunt ed. 1908), a construction followed by every branch of "the Genl. Govt, . . . thro all the vicissitudes of Party," 9 *id.*, at 333 (1910). See also The Federalist No. 37, at 228–229 (J. Madison).

That practice began in the First Congress. When it first met in 1789, one of its first and most pressing tasks was to establish the first executive departments—and with them the first "Heads of Departments." Art. II, §2, cl. 2. In doing so, it debated how those officers should be removed. Some felt that the Senate had to consent to all removals, as one

of the two entities that "appoint[ed]" the official in the first place. 1 Annals of Cong. 472–473 (Rep. Gerry). Others argued that the Constitution was silent on the question, giving Congress the "right" to select whether an officer may be removed, and if so by whom—"the President, the President and Senate, or the Legislature, or any other person whom they might introduce into office, merely for that particular purpose." *Id.*, at 521 (Rep. Sedgwick). And a third group contended that removal was part of "the Executive power" vested in the President, which "the Legislature has no right to diminish or modify." *Id.*, at 463 (Rep. Madison).

By this point, the arguments made by the third group will sound familiar. Madison led the charge. "I conceive that if any power whatsoever is in its nature Executive," and thus vested in the President, "it is the power of appointing, overseeing, and controlling those who execute the laws." *Ibid.* And if that is so, he explained, then the "power of removal from office" must follow. *Id.*, at 499. For it is only with that power that "the chain of dependence [can] be preserved"— "the lowest officers, the middle grade, and the highest" made to "depend, as they ought, on the President, and the President on the community." *Ibid.* Others agreed. Some focused on text. "[T]he power of removal [is] an Executive power," Representative George Clymer said, "and as such belong[s] to the President alone, by the express words of the Constitution." *Id.*, at 382. Others focused on structure. "The Constitution places all Executive power in the hands of the President," Representative Fisher Ames explained, "and could he personally execute all the laws, there would be no occasion for establishing auxiliaries." *Id.*, at 474. "But in order that he may be responsible to his country," he continued, "he must have a choice in selecting his assistants, a control over them, with power to remove them when he finds the qualifications which induced their appointment cease to exist." *Ibid.*

The third group emerged victorious. They successfully convinced the House of Representatives to delete a clause in the draft bill that said that the Secretary of Foreign Affairs was "to be removable by the President," for such language would "ha[ve] the appearance of conferring the power upon him" when in fact it was his all along. *Id.*, at 505, 507 (Rep. Benson). What they favored instead—and what they got—was a new clause that assumed "the power of removal to be in the President," so as to "establish a legislative construction of the Constitution." *Id.*, at 578 (Rep. Benson). The bill as amended passed the House, and then the Senate, a feat that was repeated first with laws establishing the Department of War and then again with the Treasury. These statutes thus "implicitly endorsed the view that the President had a constitutional power to remove executive officers." A. Bamzai & S. Prakash, The Executive Power of Removal, 136 Harv. L. Rev. 1756, 1793 (2023) (Bamzai & Prakash).

Congress's confirmation of the President's power quickly took hold—and even gained fame as "the Decision of 1789." "After very long debates," Madison wrote to Jefferson, Congress had endorsed the view that "the Executive function of removal" was "vested in the President," a decision "most consonant to the text of the Constitution" and "to the requisite responsibility and harmony in the Executive Department." 16 Documentary History of the First Federal Congress 893 (C. Bickford, K. Bowling, H. Veit, & W. diGiacomantonio eds. 2004). Even those who opposed Congress's decision recognized that the decision had been made. Take Representative Richard Bland Lee, who had argued that the question of who may remove officers was up to "[t]he Legislature," as it could "create and establish offices" as it saw fit. 1 Annals of Cong. 525. After the bills had been enacted, Lee wrote that it "was determined in the affirmative" that the President "had, or ought to have, from a fair Construction of the constitution," the power to remove

his own appointees. 16 Documentary History of the First
Federal Congress, at 866–867. And even those far removed
from the debates saw the issue as settled, including Chief
Justice Marshall, see 5 J. Marshall, The Life of George
Washington 199–200 (1807) (Marshall) (the decision was "a
full expression of the sense of the legislature"), Chancellor
Kent, see 1 J. Kent, Commentaries on American Law 289–
290 (1826) (the decision "firmly and definitively settled" the
matter), and Justice Story, 3 J. Story, Commentaries on the
Constitution of the United States §1537, p. 395 (1833)
(Story) (expressing doubts about the decision from first
principles, but noting that "[t]he public . . . acquiesced in
this decision" and that it "has not been questioned on many
other occasions").

Early Presidents of all persuasions, too, hewed to the De-
cision of 1789. Washington saw it as his "indispensable
duty" to remove officers who failed to live up to his expecta-
tions. 36 Writings of George Washington 216 (1941). His
Cabinet agreed, taking the stance that the ability to "re-
move from office" was "an essential attribute of Executive
Power." 20 Papers of George Washington: Presidential Se-
ries 355, 357, n. 2 (D. Hoth & W. Ferraro eds. 2019). The
first President Adams said the same. See 20 Papers of John
Adams 150–151 (S. Georgini et al. eds. 2020) (noting his
support for "the President['s] Power of Removal, according
to the Constitution"). So did Jefferson. See 4 Papers of
Thomas Jefferson, at 281 (the power to "remov[e] executive
officers [is] inherent in [the] Executive"). So did Madison.
See 2 Papers of James Madison 192 (D. Mattern, J. Stagg,
M. Johnson, & A. Colony eds. 2013) (one of the "[c]onstitu-
tional attributes of the Executive" is to determine "[t]he
tenure of the office" of subordinates). So did Monroe, along
with the second President Adams. 7 Memoirs of John
Quincy Adams 424–425 (C. Adams ed. 1875) (citing Monroe
for the view that "the tenure of all subordinate executive
Offices" is "necessarily the pleasure of the chief by whom

they were commissioned," and agreeing with "the principle established by Mr Monroe").

And so did Jackson—much to Congress's dismay. Unlike his predecessors, who (except for Jefferson) utilized their removal power sparingly, Jackson fired hundreds "of subordinates for personal and partisan reasons." L. White, The Jacksonians: A Study in Administrative History, 1829–1861, p. 33 (1954) (White); see also *id*., at 307–308. But even Jackson's most vehement critics acknowledged that he had the power to do as he pleased. "I consider it . . . a settled point," Senator Daniel Webster said, "settled by construction, settled by precedent, settled by the practice of the Government, and settled by statute." 11 Cong. Deb. 461 (1835). When Webster tried to unsettle the Decision of 1789 through new legislation, the effort failed, only further cementing the President's power. See White 41–44. As Webster—still in the Senate—put it 15 years later:

> "[S]ince the practice has become a settled practice, since every Administration has indulged in it, and since it must now be considered, as the legal construction of the Constitution, . . . it follows . . . that this power, thus legally vested in the President, must be exercised by him as independently of our control as any other power that is to be exercised by him under the Constitution." Cong. Globe, 31st Cong., 1st Sess., 1126 (1850).

### B

What text, history, and structure settle, our precedent confirms—the President may remove his subordinates at will.

### 1

Twice in the 19th century, we reaffirmed what the First Congress had held. The text of the Constitution "is silent with respect to the power of removal from office," we noted

in our first case on the subject. *Ex parte Hennen*, 13 Pet.
230, 258 (1839). But "it was very early adopted, as the prac-
tical construction of the Constitution," that the power "to
remove, where the tenure of the office was not fixed by the
Constitution," was "vested in the President alone." *Id.*, at
259. "And such would appear to have been the legislative
construction of the Constitution" too, given "the organiza-
tion of the three great departments" "in the year 1789."
*Ibid.* Our second case was of a piece. "[T]he decision of
Congress in 1789, and the universal practice of the Govern-
ment under it," we explained, "ha[s] settled the question be-
yond any power of alteration." *Parsons* v. *United States*,
167 U. S. 324, 330 (1897).

Our landmark decision, however, came 100 years ago in
*Myers* v. *United States*, 272 U. S. 52. That case arose from
an unlikely source—a dispute over management of the post
office in Portland, Oregon. See *id.*, at 106. Under an 1876
statute, the President had to receive the "advice and con-
sent of the Senate" not only to *appoint* postmasters but also
to *remove* them. §6, 19 Stat. 80. For reasons that are now
lost to history, President Wilson fired Portland's postmas-
ter, Frank Myers, and did so without the Senate's consent.
272 U. S., at 106–107. Myers sued for backpay. See *id.*, at
106.

In a scholarly opinion, Chief Justice Taft rejected Myers's
suit and reaffirmed the President's power to fire his subor-
dinates at will. That power arose, he wrote for the Court,
from the Constitution's text, history, and structure, just as
the First Congress had held in 1789. See *id.*, at 136. "The
vesting of the executive power in the President was essen-
tially a grant of the power to execute the laws," Chief Jus-
tice Taft explained. *Id.*, at 117. "As he is charged specifi-
cally to take care that [the laws] be faithfully executed, the
reasonable implication," he continued, "was that as part of
his executive power" he must be able to "remov[e] those for
whom he can not continue to be responsible." *Ibid.* "Mr.

Madison and his associates" made this same point, the Chief Justice noted, and they "dwelt at length upon the necessity there was for construing Article II to give the President the sole power of removal in his responsibility for the conduct of the executive branch." *Ibid.*

But Chief Justice Taft emphasized that it was not just the First Congress that had come to this conclusion. The First Congress supplied "a precedent upon which many future laws . . . would be based"—and if it had erred, the next Congresses would have "dissent[ed] and depart[ed]" from its view. *Id.*, at 136. Quite the opposite occurred, the Chief Justice explained. The Decision of 1789 "was soon accepted as a final decision of the question by all branches of the Government." *Ibid.* For "74 years, there was no act of Congress, no executive act, and no decision of this Court at variance with the declaration of the First Congress." *Id.*, at 163.

In the wake of the Civil War, Chief Justice Taft noted, Congress sought to "reverse this constitutional construction"—but in the end only confirmed it. *Id.*, at 164. "This reversal grew out of the serious political differences" between President Johnson—a Jacksonian Democrat—and congressional Republicans, who boasted "a two-thirds majority" in both Houses of Congress. *Id.*, at 165. Over Johnson's veto, Congress sought to "curtail the then acknowledged powers of the President" with the Tenure of Office Act, which required him to receive the Senate's consent before firing most officers. *Id.*, at 165–166.

"[T]he injury and invalidity" of the law was "immediately recognized by the Executive and objected to"—and not just by Johnson. *Id.*, at 167. "General Grant, succeeding Mr. Johnson in the Presidency"—and no fan of Johnson or his program—"earnestly recommended in his first message the total repeal" of the law. *Id.*, at 167–168. "What faith can an Executive put in officials forced upon him?" Grant asked. *Id.*, at 168. "How will such officials be likely to serve an

Administration which they know does not trust them?"
*Ibid.* Despite Grant's efforts, "[t]he feeling growing out of
the controversy with President Johnson retained the act on
the statute book"—and led to one other such law, the one
for postmasters at issue in that very case—"until 1887,"
when the Tenure in Office Act was repealed. *Ibid.*

What these events revealed, Chief Justice Taft wrote,
was not Presidential "acquiescence" but resistance, a con-
sistent rejection of "the validity of such legislation" as in-
compatible with "the legislative action of 1789." *Id.*, at 172–
173. At issue in *Myers*, then, as the Chief Justice saw it,
was whether "to set aside" the First Congress's "construc-
tion, thus buttressed, and adopt an adverse view," contrary
to the Constitution's text, history, and structure. *Id.*, at
175. The Court refused to do so. It hewed instead to the
"constitutional construction . . . reached by the First Con-
gress of the United States . . . and acquiesced in by the
whole Government for three-quarters of a century." *Id.*, at
176. Any law to the contrary, the Court concluded, was "in
violation of the Constitution, and invalid." *Ibid.*

2

While *Myers* was perhaps our best word on the subject, it
was not our last.

a

Just nine years after *Myers*, we handed down *Humphrey's
Executor*, 295 U. S. 602. The case arose out of President
Roosevelt's decision to fire one of President Hoover's ap-
pointees to the Federal Trade Commission, William
Humphrey, two years into Humphrey's seven-year term.
Humphrey lauded Hoover "as the foremost figure of the
world," a man who fought back against "the demagogue, the
fanatic, the reformer, and the fool." Washington, D. C.,
Evening Star, Mar. 11, 1932, p. D11, col. 8. On the Com-
mission, Humphrey sought to do the same. He often spoke

to the press, and described the FTC variously as "a publicity bureau" used "to spread Socialistic propaganda," Boston Globe, Dec. 14, 1926, p. 5, cols. 3–4, a "bureaucracy gone insane," N. Y. Times, Feb. 3, 1929, p. 19, col. 1, and "an instrument of oppression and disturbance and injury," Orlando Evening Star, Jan. 7, 1931, p. 3, col. 3. Roosevelt saw matters differently, and requested Humphrey's resignation. Humphrey refused, so Roosevelt fired him in a one-line letter that did not specify a cause for his removal— seemingly contrary to a statute permitting removal of Commissioners only for "inefficiency, neglect of duty, or malfeasance in office." §1, 38 Stat. 718. Humphrey died soon thereafter, and the executor of his estate sued for backpay. See 295 U. S., at 618–619.

On a day that New Dealers would dub "Black Monday," the Court ruled unanimously against the President—as it did in two other cases decided that same day, *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935), and *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555 (1935). See A. Schlesinger, The Politics of Upheaval 279–290 (1960). *Schechter* and *Radford* were quite a blow to the President, invalidating aspects of his signature legislation. *Schechter* found an unconstitutional delegation of legislative power in a statute that gave the President free rein to prescribe "standards of fair competition" business was obliged to follow. 295 U. S., at 534, 542. And *Radford* found a violation of the Takings Clause in a statute that allowed farmers who defaulted on their mortgages to retain possession of their property for years on end. 295 U. S., at 575–576, 601–602.

Having to contend with *Myers*, *Humphrey's* said far less. Justice Sutherland, writing for the Court, started by reaffirming that the President possesses "the exclusive and illimitable power" to remove "all purely executive officers," just as *Myers* held. 295 U. S., at 627–628. He then pivoted. There are some presidentially appointed officials, he

explained, who may perform "executive function[s]" but exercise "no part of the executive power." *Id*., at 628. And for those officials, "the decision in the *Myers* case cannot be accepted as controlling." *Id*., at 627.

The Court held that William Humphrey was one such official. That was because the FTC's duties were very limited—they were "neither political nor executive, but predominantly quasi-judicial and quasi-legislative." *Id*., at 624. When courts requested the FTC's help as a "master in chancery" to recommend appropriate remedies in antitrust litigation, for instance, it acted solely as a judicial aid. *Id*., at 628. When Congress requested the FTC's help to "mak[e] investigations and reports" on certain topics, it acted solely as a legislative aid. *Ibid.* And when it brought (and adjudicated) charges against corporations it suspected of using "unfair methods of competition" in commerce, it acted "in part quasi-legislatively and in part quasi-judicially." *Ibid.* Because these quasi functions did not require the use of "executive power," Justice Sutherland reasoned, Humphrey needed to answer only to Congress and the courts. *Ibid.* Although the President may be the "master in his own house," he warned, he may not "impos[e] his control in the house of another." *Id.*, at 630.

b

From the start, *Humphrey's* was tethered to a highly circumscribed and almost fictional view of the FTC's role. *Humphrey's* by its terms applied only to agencies that occupy "no place in the executive department," are "independent of executive authority," and exercise "no part of the executive power." *Id*., at 625, 628. Indeed, Justice Sutherland took pains to emphasize that "the character of the office"— executive or nonexecutive—would determine the result of future cases, and to reiterate that the Court's decision was limited "to officers of the kind here under consideration." *Id*., at 631–632.

In later cases, although *Humphrey's* announced dividing line remained intact, more and more functions, we concluded, in fact fell on the executive side of that line—and thus within the President's exclusive control. Where *Humphrey's* suggested that the power to enforce the law against particular parties could be merely "quasi-judicial," or "in aid" of federal courts, see *id.*, at 628, we held the opposite. "A lawsuit is the ultimate remedy for a breach of the law," we explained in 1976, "and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Buckley* v. *Valeo*, 424 U. S. 1, 138 (*per curiam*) (quoting Art. II, §3). And where *Humphrey's* suggested that the power to "fill[] in" "the details" of a "general standard" could be merely "quasi-legislative," or "in aid" of Congress, 295 U. S., at 628, we again held the opposite. Although "some administrative agency action . . . may resemble 'lawmaking,'" we explained in 1983, when an agency exercises "legislatively delegated authority" to regulate private conduct, it exercises "[e]xecutive" power. *INS* v. *Chadha*, 462 U. S. 919, 953, n. 16; see also *Bowsher* v. *Synar*, 478 U. S. 714, 733 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law.").

Soon enough, we recognized that *Humphrey's* flunked even its own test. "[I]t is hard to dispute that the powers of the FTC," even "at the time of *Humphrey's Executor*," we explained in 1988, "would at the present time be considered 'executive,' at least to some degree." *Morrison* v. *Olson*, 487 U. S. 654, 690, n. 28. Not one for understatement, Justice Scalia observed in dissent that the Court had "swept" *Humphrey's* "into the dustbin of repudiated constitutional principles." 487 U. S., at 725. The Court put the matter more delicately, but no less definitively. "We undoubtedly did rely on the terms 'quasi-legislative' and 'quasi-judicial'" in *Humphrey's*, the Court noted, "but our present

considered view is that" the constitutional question "cannot be made to turn on" such "rigid categories," at least for inferior officers.  487 U. S., at 689.  Contra, *post*, at 7 (SOTOMAYOR, J., dissenting) (asserting that *Morrison* v. *Olson* in fact "applied and expanded *Humphrey's*").

Fast forward another few decades, and *Humphrey's* premises had been further undermined.  In two cases, *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U. S. 477 (2010), and *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197 (2020), we again considered the permissibility of restrictions on the President's power of removal.  In both cases, we reiterated *Myers*'s rule that the President exercises "general administrative control of those executing the laws" and thus must be able to "remov[e] those for whom he can not continue to be responsible."  *Free Enterprise Fund*, 561 U. S., at 492–493 (quoting *Myers*, 272 U. S., at 117, 164); *Seila Law*, 591 U. S., at 214 (same).  In both cases, we emphasized that *Humphrey's* had to be read "on its own terms," and thus applies only to agencies that perform "'specified duties as a legislative or as a judicial aid.'"  *Seila Law*, 591 U. S., at 215, 219, n. 4 (quoting *Humphrey's Executor*, 295 U. S., at 628); see *Free Enterprise Fund*, 561 U. S., at 493.  And in both cases, we refused to extend *Humphrey's* to a "new situation"—in *Free Enterprise Fund*, two layers of for-cause removal within an agency, 561 U. S., at 483, and in *Seila Law*, for-cause removal protection for the sole head of an agency, 591 U. S., at 220.  As we put it in *Seila Law*, *Humphrey's* is not a "freestanding invitation for Congress" to limit the President's constitutional power.  591 U. S., at 228.

*Humphrey's* framework, in short, has not withstood the test of time.  While *Humphrey's* was surely right to focus on "the character of the office" at issue, 295 U. S., at 631, and surely right to say that "purely executive" powers must be controlled by the President, *id.*, at 632, we long ago

abandoned the notion that there are some powers that are only *partly* executive. Forty years have now passed, in fact, since we recognized that the FTC exercises executive power—and did so even in 1935, when *Humphrey's* was decided. See *Morrison*, 487 U. S., at 690, n. 28; *id.*, at 724–725 (Scalia, J., dissenting); see also *Seila Law*, 591 U. S., at 216, n. 2. And more than 200 years have passed since we recognized that the Constitution "vests the whole executive power in the President" alone. *Osborn* v. *Bank of United States*, 9 Wheat. 738, 819 (1824) (Marshall, C. J., for the Court).

At this point, all that is left of *Humphrey's* is its observation that an agency that "exercises no part of the executive power" need not fall within the rule of Presidential removal. 295 U. S., at 628; see *Mistretta* v. *United States*, 488 U. S. 361, 423–425, and n. 3 (1989) (Scalia, J., dissenting) (explaining that *Humphrey's* stands only for the proposition that there would be "no strict constitutional impediment to a 'branchless' agency" that exercises "no governmental power"). If Congress wishes to establish independent agencies to assist it with its functions, it may do so. Cf. *Buckley*, 424 U. S., at 137–138. But it may not foist those agencies upon the President, and thus deprive him of "the executive power vested [in him] by the Constitution"—something *Humphrey's* itself never purported to permit. *Humphrey's Executor*, 295 U. S., at 628.

c

If anything more *is* left of *Humphrey's*, we overrule it. *Humphrey's* has for decades been a result in search of a rationale. As we have often said, *stare decisis* is not an "inexorable command," *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991), and is at its weakest in constitutional cases, where only we may readily fix our own mistakes, *Agostini* v. *Felton*, 521 U. S. 203, 235 (1997). Our precedents about precedent teach that a number of factors are relevant. Here,

every factor—the "quality" of the decision's reasoning, its "consistency" with our other cases, the "workability" of its rule, and the interests of those who have "reli[ed]" on it, *Knick* v. *Township of Scott*, 588 U. S. 180, 203 (2019)— counsels in favor of letting *Humphrey's* go.

*Humphrey's* has been difficult to make sense of from the start. "[O]nly by blind feats of definition" could the Court transform powers that are quintessentially executive—investigative and prosecutorial alike—into nonexecutive "quasi-legislative" and "quasi-judicial" functions. P. Strauss, The Places of Agencies in Government, 84 Colum. L. Rev. 573, 625 (1984). As Justice Jackson memorably put it, *Humphrey's* "retreat to the qualifying 'quasi' is implicit with confession that all recognized classifications have broken down, and 'quasi' is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed." *FTC* v. *Ruberoid Co.*, 343 U. S. 470, 487–488 (1952) (dissenting opinion). When an agency "executes" a congressional mandate against private parties, it exercises executive power—no ifs, ands, or quasis about it.

For that reason, *Humphrey's* is now far out of step with our cases, which have all but limited it to its facts. See *supra*, at 18–20. We long ago retreated from *Humphrey's*. We applied it only once, in 1958, to a solely adjudicatory body that dealt with a limited category of claims for compensation from those imprisoned or interned in the Second World War. *Wiener* v. *United States*, 357 U. S. 349, 355–356. And even then, our constitutional analysis spanned only one brisk paragraph, as the case focused on the question whether the statute limited the President's power at all. See *id*., at 356. Since then, we have undermined *Humphrey's* premises at every turn. To persist in *Humphrey's* would require us to depart from almost every case on the subject we have decided since.

Little surprise, then, that no one knows how to apply *Humphrey's* in practice. Does it protect all multimember

agencies? See *Wilcox* v. *Trump*, 775 F. Supp. 3d 215, 234 (DC 2025). Or only those that are balanced along partisan lines? See *Space Exploration Technologies Corp.* v. *NLRB*, 151 F. 4th 761, 777–778 (CA5 2025). Those that wield some executive power, but not a lot? See *Consumers' Research* v. *Consumer Prod. Safety Comm'n*, 98 F. 4th 646, 652 (CA5 2024) (Oldham, J., dissenting from denial of rehearing en banc). Or only those that do not wield the President's "conclusive and preclusive" powers? See Brief for Respondent 25–28. Or perhaps it is only those that are "materially indistinguishable from the 1935 FTC"? See *Harris* v. *Bessent*, 2025 WL 980278, \*15 (CADC 2025) (Walker, J., concurring). With its indeterminacy and unpredictability, *Humphrey's* "has undermined the very 'rule of law' values that *stare decisis* exists to secure." *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 411 (2024) (quoting *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 798 (2014)); see also *In re Aiken County*, 645 F. 3d 428, 442–446, and nn. 3–4 (CADC 2011) (Kavanaugh, J., concurring).

All that is left is reliance, upon which Slaughter (and the dissent) rely. Slaughter argues that Congress has relied upon *Humphrey's* to create agencies that are "insulated from presidential control." Brief for Respondent 15; see also *post*, at 34–40 (SOTOMAYOR, J., dissenting). That is precisely the problem. Despite what *Humphrey's* may say, independent agencies are not "independent" in the sense that they are free of the President and thus responsive "only to the people of the United States." 295 U. S., at 625. Independent agencies are insulated "from the President," "not from politics." *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. 502, 523 (2009) (plurality opinion). "As a practical matter, successful insulation of administration from the President—even if accomplished in the name of 'independence'—will tend to enhance Congress's own authority over the insulated activities." E. Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2271, n. 93 (2001).

Placing the power to administer laws in officers who enjoy "freedom from Presidential oversight (and protection)," in other words, does not deliver us to a promised land of technocratic governance—it often results only in an "increased subservience to congressional direction." *Fox Television*, 556 U. S., at 523 (plurality opinion). Congress may well have relied on *Humphrey's* in taking more power for itself, but that is hardly one of the "legitimate" reliance interests that our precedents contemplate. *South Dakota* v. *Wayfair, Inc.*, 585 U. S. 162, 186 (2018) (internal quotation marks omitted); cf. *NLRB* v. *Noel Canning*, 573 U. S. 513, 571–572 (2014) (Scalia, J., concurring in judgment). No branch may rely on adverse possession to claim power that the Constitution vests elsewhere.[3]

The dissent contends that we ignore the reliance interests of "[o]rdinary Americans and regulated firms alike."

―――――――――

[3] The dissent nevertheless insists that "[i]ndependence was centrally important to Congress in creating these agencies" and indeed that "[a]t no point was it proposed that a commission ought to be set up unless it be independent." *Post*, at 36 (internal quotation marks omitted). To the extent that consideration is relevant, it is relevant only in the context of severability. In our prior cases, "when confronting a constitutional flaw in a statute" like the one before us, we have sought to limit "the solution to the problem," severing the invalid removal provision "while leaving the remainder intact." *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 508 (2010) (internal quotation marks omitted); see also *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 233–238 (2020) (opinion of ROBERTS, C. J., joined by ALITO and KAVANAUGH, JJ.) (deeming a removal provision severable); *id.*, at 296–297 (KAGAN, J., joined by Ginsburg, Breyer, and SOTOMAYOR, JJ., concurring in judgment with respect to severability and dissenting in part) (same). If the dissent now disagrees with that approach, and believes that Congress generally "would have preferred no [agency] at all to [an agency] whose members are removable at will," *Free Enterprise Fund*, 561 U. S., at 509, it is free to urge as much in a case in which the severability question is before us. In any event, the solution to "an Executive Branch that Congress never dreamed of establishing," *post*, at 38 (SOTOMAYOR, J., dissenting), is not a headless fourth branch that the Framers never dreamed of establishing.

*Post*, at 39. Quite the contrary. "In its valiant search for reliance interests," it is "the dissent [that] somehow misses maybe the most important one: the reliance interests of the American people . . . in the preservation of our constitutionally promised liberties." *Ramos* v. *Louisiana*, 590 U. S. 83, 110–111 (2020) (plurality opinion of GORSUCH, J., joined by, *inter alios*, SOTOMAYOR, J.). "The diffusion of power carries with it a diffusion of accountability." *Free Enterprise Fund*, 561 U. S., at 497. When power is exercised well, the people know whom to thank; when power is exercised poorly, they know whom to blame—and whom to fire. That is the very premise of our system of government. See The Federalist No. 70, at 424 (A. Hamilton) ("The ingredients which constitute safety in the republican sense are a due dependence on the people, and a due responsibility."). We adhere to that system today not in spite of the reliance interests of all Americans but because of them.

## III
### A

With these principles in mind, this is not a close case. The FTC's for-cause removal provision violates the separation of powers. In its present form, the FTC enforces and administers some 80 statutes, which cover almost every facet of our Nation's economy. The tasks it undertakes are "the very essence of 'execution' of the law"—precisely the President's constitutional role. *Bowsher*, 478 U. S., at 733.

First, the FTC has the power to promulgate substantive rules that carry the force of law. In the consumer-protection realm, for instance, the FTC is tasked with giving content to the startlingly abstract idea of "acts or practices which are unfair or deceptive." 15 U. S. C. §57a(a)(1)(B). In other areas, it must, for example, determine what "documentary material and information" one company must provide when it wishes to acquire another, §18a(d), decide when and how websites must seek "verifiable parental

consent" when their services collect children's personal information, §6502(b), and "prescribe as necessary or appropriate in the public interest or for the protection of United States citizens" rules barring the use of any "manipulative" technique in the sale of gasoline, 42 U. S. C. §17301. The power to flesh out such statutory regimes—and to do so through discretionary actions, largely outside the remit of courts—is executive through and through. *Seila Law*, 591 U. S., at 218–220.

Second, the FTC not only investigates businesses to ensure they comply with its statutes and rules, 15 U. S. C. §§43, 46(a), 49, but enforces those statutes and rules through in-house adjudications. Indeed, it may even place the onus on a private party to comply with its orders—on pain of monetary penalties—before the case reaches the courts. See §45(g)(2). This power, too, is executive. *Seila Law*, 591 U. S., at 219 (discussing the ability to "unilaterally issue final decisions" in "administrative adjudications").

And third, the FTC files civil suits on behalf of the United States in federal court. It may select its remedies freely—from injunctions, §53(b), to civil penalties, §45(m), to any relief "necessary to redress injury to consumers," including the "refund of money or return of property," §57b(b).[4] As we have said many times, the "discretionary power to seek judicial relief" lies at the very core of executive authority.

---

[4] This is no empty threat. In just the last few years, the FTC has sought and secured civil penalties in the hundreds of millions and billions of dollars. See, *e.g.*, *FTC* v. *Amazon.com, Inc.*, No. 2:23–cv–00932 (WD Wash., Sept. 25, 2025), ECF Doc. 535, p. 8 (entering $2.5 billion judgment pursuant to the Restore Online Shoppers' Confidence Act); *United States* v. *Epic Games, Inc.*, No. 5:22–cv–00518 (EDNC, Feb. 7, 2023), ECF Doc. 15, p. 28 (entering $550 million judgment pursuant to the Children's Online Privacy Protection Act of 1998); *FTC* v. *Equifax, Inc.*, No. 1:19–cv–03297 (ND Ga., July 23, 2019), ECF Doc. 6, pp. 27–31 (entering $425 million judgment pursuant to a rule issued under the Gramm-Leach-Bliley Act).

*Buckley*, 424 U. S., at 138; see also, *e.g.*, *United States* v. *Texas*, 599 U. S. 670, 678–679 (2023) (it is up to the Executive to "decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" (internal quotation marks omitted)).  That "quintessentially executive" power may not be cleaved off from the Executive Branch.  *Seila Law*, 591 U. S., at 219.

The FTC unquestionably exercises executive power, and must therefore be controlled by the Chief Executive, in whom such power is vested.  It follows, then, that Slaughter served as the President's subordinate at the FTC—and that the President was entitled to cut her tenure short.

## B

Because the FTC's activities fall well within the heartland of executive power, we have no occasion today to define the bounds of what such power entails.  As our precedents recognize, not all offices created by Congress necessarily come with executive or even sovereign power attached.  See, *e.g.*, *Buckley*, 424 U. S., at 137–138 (contrasting the "discretionary power to seek judicial relief" with powers "of an investigative and informative nature," which may "be regarded as merely in aid of the legislative function of Congress").  To suggest otherwise would come as a surprise to, among other congressionally chartered entities, the Boy Scouts of America, 112 Stat. 1325, the Society of American Florists and Ornamental Horticulturalists, ch. 876, 31 Stat. 1453, and Georgetown University, ch. 70, 6 Stat. 152.

Relatedly, we have left open the possibility that some functions traditionally handled outside the Executive Branch may not be encompassed by *Myers*'s general rule.  Indeed, *Myers* itself placed "the greatest weight" on the early Congresses' (and early Presidents') "contemporaneous legislative exposition" of the Executive's constitutional role. 272 U. S., at 174–175.  And one example we have given of an entity that may have such a unique role is the Federal

Reserve, to the extent that it follows in the distinct historical tradition of the First and Second Banks of the United States—both of which influenced monetary policy and neither of which were subject to plenary Presidential control. See *Seila Law*, 591 U. S., at 222, n. 8. Our prior cases do not necessarily implicate the constitutionality of such arrangements. Our opinion today should not be read to do so either.

Nor do we determine the fate of officials not before us. In particular, as the Solicitor General recognized at argument, the permissibility of tenure protections for the judges of "non-Article III courts," such as the Tax Court and the Court of Federal Claims, is not "presented" or "briefed" in this case and poses a "different set of questions." Tr. of Oral Arg. 15, 28. We leave those questions for another day. All we do today is recognize what has been clear for a century— that those who fall within the President's "general administrative control" must be removable by the President at will. *Myers*, 272 U. S., at 135.

IV

Although she disagrees with our conclusion, Slaughter at least accepts many of our premises. She agrees, for instance, that officers with "purely executive functions," like the "postmaster in *Myers*," must be removable at will by the President. Tr. of Oral Arg. 93. She agrees that "*Seila Law* is correct." *Id.*, at 115. And she agrees that "the Vesting Clause of Article II . . . establish[es] a general default presidential removal power." *Id.*, at 136.

The dissent, on the other hand, sweeps the chess pieces off the board, rejecting not only *Free Enterprise Fund* and *Seila Law* but *Myers* and the Decision of 1789 as well. On its view, "there is no evidence that those who shaped or ratified the Constitution adopted the . . . general rule of at-will removal," *post*, at 14—no matter the view expressed by Washington, Jefferson, Madison, and Hamilton in the first

years of the Republic; no matter the practice of the First Congress and all our early Presidents; and no matter the Convention's insistence upon "[u]nity in the Executive," 1 Farrand's Records 66 (J. Wilson).

To support its own position, the dissent relies on two passing comments in The Federalist. See *post*, at 15–17. Neither one helps. In Federalist No. 39, Madison noted that the "tenure" of "ministerial offices . . . will be a subject of legal regulation," The Federalist No. 39, at 242, but it beggars belief to suggest that he intended so obliquely to permit Congress to hem in the President—it is far more likely that he intended only to endorse "regulation" of "tenure" in the sense of a limited term for executive officers, subject to Presidential removal in the interim.[5] And in Federalist No. 77, Hamilton said that the Senate's consent "would be necessary to displace as well as to appoint," *id.*, No. 77, at 459, but it remains a subject of scholarly debate whether Hamilton meant "displace" in the sense of "remove" or "replace." Certainly the idea that the Senate could force a new President to keep his predecessor's Cabinet Secretaries is at odds with Hamilton's claim that the Senate "cannot themselves *choose*" who will fill an office, even "if they withheld their assent" to the President's pick, *id.*, No. 66, at 405; at odds with Hamilton's claim that the executive power is vested in

———————

[5] Indeed, that is precisely what Madison would propose a year later for the Comptroller of the Treasury. The dissent (quoting *Humphrey's*) thus errs in asserting that Madison ever "suggested" that Congress may "forbid Presidential removal" of the Comptroller. *Post*, at 5–6 (internal quotation marks omitted); see also *post*, at 22–23, 31, 43 (reiterating the point). As we have twice now explained, "Madison's actual proposal, consistent with his view of the Constitution, was that the Comptroller hold office for a term of 'years, unless sooner removed by the President'; he would thus be 'dependent upon the President, because he can be removed by him,' and also 'dependent upon the Senate, because they must consent to his [reappointment] for every term of years.'" *Free Enterprise Fund*, 561 U. S., at 500, n. 6 (quoting 1 Annals of Cong. 612 (1789)); *Seila Law*, 591 U. S., at 227, n. 10 (same).

"one man" and is not subject "to the control and co-operation
of others," *id.*, No. 70, at 424; and at odds with Hamilton's
claim that executive officers are "the assistants or deputies
of the Chief Magistrate" and thus must "derive their offices
from his . . . nomination" and remain "subject to his super-
intendence," *id.*, No. 72, at 436. Whatever Hamilton meant
at first, by 1793 he had expressly recognized that "[t]he
power of removal from office" forms part of "the EXECUTIVE
POWER of the Nation . . . vested in the President." Pacificus
No. 1 (June 29, 1793), in 15 Papers of Alexander Hamilton
39–40 (H. Syrett ed. 1969). We see little reason why one
line (really one word) from Federalist No. 77 should take
precedence over the logic of The Federalist as a whole.

We certainly see no reason why it should take precedence
over the Decision of 1789. When it comes to those debates,
the dissent has little to offer, beyond its efforts to limit the
decision's scope. Says the dissent: "The House in 1789 did
not address whether Congress could place any limits on the
President's power to remove," for it debated only whether
the President had such a power "*at all.*" *Post*, at 19. The
two, however, are one and the same. In holding that the
President has the power to remove his subordinates "with-
out an express grant from Congress," *post*, at 20 (opinion of
SOTOMAYOR, J.), Congress held that "the power of removal"
forms part of "the Executive power," 1 Annals of Cong. 382
(Rep. Clymer). And to the extent that the power of removal
is part of the executive power, it is as much outside Con-
gress's control as the President's power to grant pardons,
veto bills, and recognize foreign sovereigns. See *Schick* v.
*Reed*, 419 U. S. 256, 266 (1974) (a Presidential power that
"flows from the Constitution . . . cannot be modified,
abridged, or diminished by the Congress"); *Zivotofsky* v.
*Kerry*, 576 U. S. 1, 29–32 (2015).

That is why no one at the time saw the First Congress as
having endorsed merely a "default" "Presidential removal
power" (if such a thing is not a contradiction in terms). *Post*,

at 13, 21 (opinion of SOTOMAYOR, J.). Madison, in fact, said just the opposite. Because "the Executive power" vested in the President includes the power "to remov[e] . . . from office," he explained, "the Legislature has no right to diminish or modify" that power. 1 Annals of Cong. 463. Chief Justice Marshall agreed, explaining that the Decision of 1789 viewed the President's "power of removal" as "fixed in the constitution" and thus free from "legislative instability." 5 Marshall 200. The same was true for Justice Story, who said that the decision "expressed the sense of the legislature, that the power of removal by the executive [of principal officers] could not be abridged by the legislature." 3 Story §1531, at 390, n. 1.[6]

With no support in the First Congress's actual debate on the subject, the dissent (this time joined by Slaughter) turns to three early agencies that it contends were "at least semi-independent." *Post*, at 24–26; see also Brief for Respondent 14–16. But the members of these agencies, too, were removable by the President at will. Indeed, the first of the three, the Revolutionary War Debt Commission, was composed solely of Presidential appointees, with a statute that did not purport to limit the President's power of

_____

[6] Despite having led with Story, the dissent eventually tries to call it a draw. Compare *post*, at 2 (listing Story in the pantheon of jurists who supposedly would join today's dissenters), with *post*, at 23 (describing Story's position as "equivocal" and "unclear"). Story was in fact quite clear. He identified the very "question" at issue in this case: "[W]hether congress can give any duration of office in such cases [of principal officers], not subject to the exercise of this [Presidential] power of removal?" 3 Story §1531, at 389. He then gave the First Congress's answer (as already quoted): "In the debate in 1789 . . . the very question was discussed; and the final vote seems to have expressed the sense of the legislature, that the power of removal by the executive could not be abridged by the legislature; at least, not in cases, where the power to appoint was not subject to legislative delegation." *Id*., §1531, at 390, n. 1. There is no shame in disagreeing with Story's appraisal of the Decision of 1789, but that is the reality of the dissent's position.

removal.  See Act of Aug. 5, 1790, ch. 38, 1 Stat. 178.[7]  And
the latter two, the Mint Board and the Sinking Fund Com-
mission, were both composed mostly of Cabinet Secretaries,
who (all agree) could be fired at any time.  See Act of Apr.
2, 1792, 1 Stat. 250 (Mint Board); Act of Aug. 12, 1790, ch.
47, 1 Stat. 186 (Sinking Fund Commission).  The only ques-
tion arises as to one member of the Mint Board (the Chief
Justice) and two members of the Sinking Fund Commission
(the Chief Justice and the Vice President).  Of course the
President could not fire either one from his underlying po-
sition, but that did not mean that he was unable to oust
them from service within the Executive Branch itself.  See
Bamzai & Prakash 1842–1843.  It is true that the President
could not "add a new Vice President or Chief Justice" to re-
place them, *post*, at 25, n. 10 (opinion of SOTOMAYOR, J.),
but that poses no constitutional problem.  Either way, the
President remains responsible—if he chooses to keep them
in office, he is responsible for their conduct; if he chooses to
remove them, he is responsible for the conduct of those who
are left.  Certainly these examples do not show that the
founding-era Congress thought that it could take away the
President's power and give it to someone else, much less the
Chief Justice or the Vice President.

  With no support in the founding era as a whole, the dis-
sent opts to skip ahead a century or two.[8]  See *post*, at 10–

————————

  [7] Quoting a letter from Hamilton in which he described the Commis-
sioners as "'distinct and Independant Officers,'" the dissent infers that
they must not have been removable by the President.  *Post*, at 25 (quoting
16 Papers of Alexander Hamilton 145 (H. Syrett ed. 1972)).  Hamilton,
however, said only that the Commissioners were "distinct and Independ-
ant" from "*[t]he Treasury*"—not the President.  *Id*., at 145 (emphasis
added).

  [8] Searching for earlier precedents, the dissent attempts to enlist Pres-
ident Lincoln as an "active participa[nt]" in its cause.  *Post*, at 11.  It does
so, however, based solely on a law "'adopted without discussion' during
the heat of the Civil War and abandoned" only a year later, "before it
could be 'tested by executive or judicial  inquiry.'"  *Seila Law*, 591 U. S.,

12. "Today," the dissent notes, "dozens of agencies are headed by commissioners or board members removable only for cause," and "this longstanding practice" (it contends) "should be entitled to significant weight." *Post*, at 11–12. We have never endorsed such a practice-makes-perfect theory of congressional power, and in fact rejected it in *INS* v. *Chadha*, 462 U. S. 919 (1983). At issue in *Chadha* were the nearly 300 legislative vetoes adopted by the political branches over the course of 50 years—with more and more enacted each year. See *id.*, at 944–945. As we saw matters, however, the popularity of the congressional veto only "sharpened" our review. *Id.*, at 944. Such "'political inventions'" must remain subject to "the demands of the Constitution," we said, lest the political branches amend by agreement "integral parts of the constitutional design." *Id.*, at 945–946. We say the same today.

To bolster its reliance on modern practice, the dissent focuses on a modern case, *Humphrey's*.[9]  But it defends a

―――――――――

at 220 (quoting *Myers*, 272 U. S., at 165). It perhaps goes without saying, but Lincoln—whose contemporaries called him "Abraham Rex"; who called himself the "master" of his administration; and who told his appointees that he "must . . . be the judge, how long to retain in, and when to remove any . . . from his position"—likely did not see Presidential power the same way the dissent does. 2 M. Burlingame, Abraham Lincoln: A Life 55, 456, 657 (2008).

[9] The dissent also invokes *Marbury* v. *Madison*, 1 Cranch 137 (1803), but that case has nothing to do with this one. It is true that Chief Justice Marshall held (as the dissent puts it) that "an office[r] with a 5-year fixed-term tenure was 'not removable at the will of the executive,'" *post*, at 27–28 (quoting *Marbury*, 1 Cranch, at 162), but the dissent ignores the fact that the "officer" in question was a justice of the peace in the District of Columbia. Such justices do not exercise executive power. They instead exercise the judicial power of the District, just as territorial judges exercise the judicial power of their respective territories. See *Sere* v. *Pitot*, 6 Cranch 332, 336–337 (1810) (Marshall, C. J., for the Court); *American Ins. Co.* v. *356 Bales of Cotton*, 1 Pet. 511, 545–546 (1828) (same); see also *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524, 619 (1838). The fact that Congress may prohibit the President from firing the District's judges (who do not exercise his power) says nothing about

version of *Humphrey's* that does not exist. On the dissent's telling, *Humphrey's* makes this a "profoundly easy case," as *Humphrey's* squarely holds that Congress may "forbid Presidential 'removal'" "[f]or an agency of this 'character.'" *Post*, at 2, 5 (quoting *Humphrey's*, 295 U. S., at 631); see also *post*, at 1–2, 5–12, 27–30, 34–46 (relying on *Humphrey's*). Only halfway through a footnote does the dissent acknowledge that "*Humphrey's* described the FTC [in 1935] as sharing 'no part of the executive power,'" *post*, at 8, n. 1 (quoting *Humphrey's*, 295 U. S., at 628), which presumably forms part of an agency's "character." Nowhere does the dissent argue, however, that the FTC today exercises "no part of the executive power" or (to quote further from *Humphrey's*) that the FTC occupies "no place in the executive department" and ought to be "independent of executive authority." *Id.*, at 625, 628. The dissent may not keep the parts of *Humphrey's* it likes and discard the rest.

Indeed, the dissent's ode to *stare decisis* is hard to reconcile with its reinvention of *Humphrey's* and shabby treatment of *Myers*. At least we have accorded *Humphrey's* a respectful burial; the dissent would cast *Myers* aside without a second thought. See *post*, at 29–30 (denigrating *Myers*). It is entitled to propose as much, of course, but it can hardly claim the mantle of *stare decisis* in doing so.

When it comes to its own proposal for how precisely *Humphrey's* should work in practice, the dissent says very little. Slaughter, for her part, is left with the vague argument that we should police Congress's decisions for "reasonableness." "[I]f Congress reasonably decides that the President should be able to remove some duly appointed officers only for certain causes and through certain processes," she

_____

whether Congress may prohibit the President from firing his subordinates (who do). Indeed, Chief Justice Marshall must have thought as much, for he felt free to write just four years after *Marbury* that "the power of removal by the president . . . was by fair construction, fixed in the constitution," as determined by the Decision of 1789. 5 Marshall 200.

argues, the courts should respect that decision, and require that the President "discharge his obligations under the Take Care Clause by going through those processes when warranted." Brief for Respondent 25 (internal quotation marks omitted).

That supposed limiting principle is neither limiting nor much of a principle. On Slaughter's view (and presumably the dissent's), Congress could commandeer the Environmental Protection Agency, the Department of Commerce, the Department of Education, the Department of Health and Human Services, most (if not at all) of the Department of Justice, and a number of other agencies besides. Indeed, it is not clear to us why Congress would need to allow the President any say in firings. If it is so "critical" for an agency "to have independence and to act with impartiality free from the suspicion of partisan direction," Brief for Respondent 22 (alterations and internal quotation marks omitted), then why should the President have a role at all? Certainly those legislators who disagreed with the Decision of 1789 were happy to leave him out. See 1 Annals of Cong. 521 (Rep. Sedgwick) (arguing that Congress may vest the removal power in "the President, the President and Senate, or the Legislature, or any other person whom they might introduce into office, merely for that particular purpose").

The answer, then as now, is that these officers exercise the *President's* power, not their own, and thus must be *responsible* to him. We do not allow intrusions on Article I nor on Article III. See *INS* v. *Chadha*, 462 U. S. 919; *Stern* v. *Marshall*, 564 U. S. 462 (2011). We see no reason to allow intrusions on Article II either.

\* \* \*

Our Constitution creates three branches, but only one President. That President is not all powerful—not by any means. See, *e.g.*, *Ex parte Milligan*, 4 Wall. 2 (1866); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579

(1952); *United States* v. *Nixon*, 418 U. S. 683 (1974). But he is not impotent either. He and he alone is vested with "[t]he executive Power" of the United States. Art. II, §1, cl. 1.

To "discharg[e] the duties of his trust," the President must have the assistance of officers he can trust. 30 Writings of George Washington, at 334. Although it is up to the Senate to decide whether to confirm those with whom the President would *prefer* to work, neither Congress nor the courts may saddle him with those with whom he *cannot* work. Subordinates who exercise the President's power are subject to removal by him. Then, and only then, can they remain accountable to the President, and the President to the people.

The judgment of the United States District Court for the District of Columbia is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 25–332

———

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* REBECCA KELLY SLAUGHTER

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2026]

JUSTICE GORSUCH, concurring.

To fulfill his constitutional duty to ensure the laws are faithfully executed, the Court holds, the President must have the ability to remove principal officers who exercise executive power in his name. That includes those who run independent agencies like the Federal Trade Commission (FTC). *Ante,* at 2. With all this, I agree.

But neither can I ignore the implications that follow. Today, independent agencies do not just exercise executive law-enforcement powers. Congress has also delegated to them vast legislative and judicial powers, effectively allowing these agencies to make laws and decide disputes under them. And, after today's decision, the President can effectively exercise all those powers too.

It's a development that raises important questions, not least these: Would Congress have delegated so much power, including legislative and judicial power, to independent agencies had it known that the President would come to control them? How will Congress respond now—if realistically it can? And what, if anything, will this Court do about it?

# I
## A

Begin with how we got here. One strand of the story runs this way, and it starts in the academy. In the early 20th century, a group of scholars including Woodrow Wilson and James Landis came to the view that our "simple tripartite form of government" was "inadequa[te] . . . to deal with modern problems." J. Landis, The Administrative Process 1 (1938) (Landis). Really, they thought, our constitutional system had become "unworkable." F. Goodnow, Politics and Administration 14 (1900) (Goodnow); see also H. Laski, Authority in the Modern State 70–71 (1919).

To meet modern challenges, Wilson and others argued, American government needed to reorient itself around the goal of operating with the "utmost possible efficiency." W. Wilson, The Study of Administration, 2 Pol. Sci. Q. 197 (1887) (Wilson, Study of Administration). Impressed by the perceived competence of the Prussian bureaucracy, they called on the Nation to stop "dogmatiz[ing] about the constitution of government." *Id.*, at 197–199 (emphasis deleted); see also *id.*, at 204, 217. In our changing world, they said, the project of "distinguish[ing] . . . between" legislative, executive, and judicial powers had to "g[i]ve way . . . to the exigencies of governance." Landis 1–2.

All told, Wilson and his followers argued for an entirely new model of "[p]ublic administration." Wilson, Study of Administration 212. To be sure, this model had its nuances, and its proponents their disagreements. But a few ideas were central to the project. First, new agencies needed to be created and staffed by scientific and technical "expert[s]" with the "technical skill" to translate "far-reaching . . . legislation into reality." Landis 25–26; *id.*, at 23–25 (emphasizing the "need for expertness").

Second, these experts had to be insulated from political control. As Wilson put it, the Nation's traditional commitment to "popular sovereignty" entrusted too much to a

"selfish, ignorant, timid, stubborn, or foolish" people. Wilson, Study of Administration 207–208. And letting the public anywhere near the new bureaucracies would amount to letting "a rustic handl[e] delicate machinery." *Id.*, at 215; see also W. Wilson, Shorthand Diary, in 1 Papers of Woodrow Wilson 143 (A. Link ed. 1966) ("[U]niversal suffrage is at the foundation of every evil in this country"); cf. Goodnow 85.

Finally, to fulfill their new responsibilities, politically insulated agency experts needed power. Lots of it. Much more than just executive authority to enforce the laws Congress writes. They also required authority over "legislative and judicial acts." W. Wilson, Notes for Lectures on Administration at the Johns Hopkins (1891), in 7 Papers of Woodrow Wilson 136 (A. Link ed. 1969) (Wilson, Notes). All told, they needed "legislative power," "executive power," and—while they were at it—"whatever power might be required to achieve the desired results." Landis 10; see also Wilson, Notes 138 (describing as "advantag[e]ous" the Prussian "union . . . of legislativ[e], administrative, and judicial functions").

B

Influential as these ideas were, they met with some hard realities as they progressed from the academy into the halls of government. For an illustration, look no further than the FTC itself and the case at the center of today's dispute, *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935). Congress created the FTC in 1914 through legislation that by-then President Wilson signed into law. See ch. 311, 38 Stat. 717. In establishing the agency, Congress endowed it with considerable power both to define and prosecute "unfair methods of competition." *Id.*, at 719–720. And in the same breath, Congress insulated the agency's leadership from democratic control, at least to a degree: Once leaders were appointed by the President and confirmed by the

Senate, Congress provided, the President could remove
them only "for inefficiency, neglect of duty, or malfeasance
in office." *Id.*, at 718.

Even so, the notion that the FTC and agencies like it
would be led by technical experts who would neutrally and
scientifically chart the Nation's path soon began to look a
bit "quaint." See E. Kagan, Presidential Administration,
114 Harv. L. Rev. 2245, 2261 (2001). Maybe that was be-
cause politicians remained in control of the appointment
and confirmation processes. Maybe it was because they re-
tained so many other ways to influence an agency's actions.
Maybe it was because policymaking, even when performed
by technical experts, almost always requires tradeoffs be-
tween competing values. Or maybe it was because of some
combination of these and other factors. See N. Rao, Admin-
istrative Collusion: How Delegation Diminishes the Collec-
tive Congress, 90 N. Y. U. L. Rev. 1463, 1477–1484 (2015).

Whatever the causes, it didn't take long for the problem
to surface. Just take William E. Humphrey. In 1925, about
a decade after giving up his seat in Congress for a failed
Senate bid, he landed a job as one of the FTC's Commission-
ers. See G. Davis, The Transformation of the Federal Trade
Commission, 1914–1929, 49 Miss. Valley Hist. Rev. 437,
445–448 (1962). It seems Humphrey's primary qualifica-
tion for the job wasn't so much his technical expertise as his
loyalty to the Republican party then holding the White
House, along perhaps with his "close connection[s] with
northwestern lumber interests, which had suffered the un-
favorable publicity of [an FTC] investigation" in recent
years. *Id.*, at 445.

If politics rather than neutral technical expertise landed
Humphrey the job, they also soon made him a target for re-
moval. Shortly after Democrats swept the election of 1932,
President Franklin D. Roosevelt fired Humphrey. The
President did not accuse him of inefficiency, neglect of duty,
or malfeasance, the standard Congress had set for the

removal of FTC Commissioners. See 38 Stat. 718. Nor does it seem the President was especially concerned with Humphrey's expertise (or lack of it). Instead, it appears that President Roosevelt could not tolerate the "adamant[ly] conservative" Humphrey holding influence over the FTC during "an important phase of the New Deal," and he wanted someone more sympathetic for the job. W. Leuchtenburg, The Case of the Contentious Commissioner: Humphreys' Executor v. U. S., in Freedom and Reform 305– 306 (H. Hyman & L. Levy eds. 1967); see also *id.*, at 305 (reciting Humphrey's complaint that he had been fired for "'purely political reasons'" (quoting Letter from W. Humphrey to G. Norris (Oct. 4, 1933))).

## C

If the Wilsonian vision of agencies run by neutral experts began buckling under the weight of reality early on, another feature of the plan stuck. Those in charge of these new agencies often became very difficult to dislodge. Whether this result represented a faithful manifestation of the Wilsonian project or something else entirely poses an interesting question (political actors—like Humphrey—insulated from politics?). But that is how things unfolded, and once again Humphrey was at the center of it all. So was this Court.

When President Roosevelt fired Humphrey, he had good reason to think he stood on firm legal ground. To be sure, Congress had imposed statutory restrictions on his removal authority and the President had not even pretended to comply with those restrictions when he dismissed Humphrey. But less than a decade earlier, this Court had held in *Myers* v. *United States*, 272 U. S. 52 (1926), that Article II of the Constitution extends to the President the power, unbounded by contrary statutes, to remove presidentially appointed officers like Humphrey. See *id.*, at 163–176.

As it turned out, the President's expectations proved misplaced. When Humphrey sued to challenge his dismissal, this Court brushed *Myers* aside, upheld Congress's removal restrictions, and declared Humphrey's firing unlawful even though he was in no position to reclaim his post. He died during the course of the litigation, leaving his heirs as the only immediate winners; the decision paved the way for them to secure his backpay. See *Humphrey's*, 295 U. S., at 618, 632. But the broader implications of the Court's decision were unmistakable and met with mixed reactions. James Landis greeted the decision with "deligh[t]." J. Landis, Mr. Justice Brandeis: A Law Clerk's View, 46 Publications of the Am. Jewish Hist. Soc. 467, 472 (1957). No wonder. The Supreme Court, after all, had just signed off on at least one aspect of his new model of public administration by permitting Congress to insulate agency leaders from direct presidential control. Meanwhile, and for exactly the same reason, President Roosevelt reportedly "saw in the decision the most direct of all possible trespasses on his powers as Chief Executive" and "was completely infuriated." J. Alsop & T. Catledge, The 168 Days 14 (1938). So much so that "[i]t may very well have been [*Humphrey's*], even more than the other decisions of 1935, which provided the motive for" President Roosevelt's subsequent attempt to pack the Court. R. Tugwell, The Democratic Roosevelt 392 (1957).

But if *Humphrey's* invited very different reactions, there was perhaps one thing nearly everyone could agree on. After the Court's ruling, Congress rolled out one new "independent" agency after another. Of course, the term "independent" was always a bit of a misnomer. As we've seen, these agencies were never truly independent from politics or even the influence of the President's appointment powers. But the leadership of these new agencies at least enjoyed protection against at-will presidential removal. And Congress turned out so many new independent agencies that a committee President Roosevelt assembled a few

years later complained of the rise of a new "headless 'fourth branch' of the Government, a haphazard deposit of irresponsible agencies and uncoordinated powers," one that did "violence to the basic theory of the American Constitution." President's Committee on Administrative Management, Report on Administrative Management in the Government of the United States 36 (1937) (Roosevelt Committee). In all, the Committee found, Congress had already created "a dozen" agencies "independent" of the President. *Id.*, at 36, 40; see also Investigation of Executive Agencies of the Government, 75th Cong., 1st Sess., 85 (S. Comm. Print 1937, prepared by the Brookings Inst.) (describing "vast and extremely important fields of Government activity almost removed from the President's direct administrative control").

## D

Congress's newfound ability to insulate agencies from direct presidential control may have encouraged it to lean into the last essential pillar of Wilson's design too. In *Humphrey's* wake, Congress increasingly assigned broad powers to the agencies it created, including legislative and judicial powers. Before *Humphrey's*, delegating those sorts of authorities to an agency risked "merely increasing" the President's own power—he might remove agency heads and seek new ones who would do his bidding. Landis 46; see also I. Sharfman, The Interstate Commerce Commission: A Study in Administrative Law and Procedure, pt. 2, p. 453 (1931). But *Humphrey's* changed the equation, making independent agencies more tempting repositories for delegated powers that the President could not access with quite such ease.

The result? Independent agencies today hold tremendous sway over the Nation's affairs. They regulate our businesses, 15 U. S. C. §57a, and our financial markets, §78w. They set the rules for the internet and airwaves. 47 U. S. C. §303. They decide how we light our homes, 42 U. S. C.

§§7171–7172, how we run our elections, 52 U. S. C. §30106, and the manner of our employment, 29 U. S. C. §§153, 160. They determine what toys our children will play with, 15 U. S. C. §§2063(a)(2), (3), (d)(2), and how we interact with each other at work, 42 U. S. C. §2000e–5. And, as the dissent explains, so much more. See *post,* at 38 (opinion of SOTOMAYOR, J.).[1]

Often, these agencies do all this with hardly any statutory guidance, based on broad grants of legislative authority. The FTC, for example, enjoys what the Court calls the "startlin[g]" power to define, outlaw, and prosecute any "'acts or practices which are unfair or deceptive.'" *Ante,* at 25 (quoting 15 U. S. C. §57a(a)(1)(B)). The Securities and Exchange Commission (SEC) may "make such rules and regulations as may be necessary or appropriate to implement," 15 U. S. C. §78w(a)(1), its mandate "to insure the maintenance of fair and honest markets," §78b. The Federal Communications Commission (FCC) has "exclusive authority to grant licenses" to broadcasters "'based on 'public convenience, interest, or necessity.'" *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 553 (1990) (quoting 47 U. S. C. §303). One could go on.

Nor have these agencies hesitated to employ the powers Congress has given them. Take a few examples from just the past two years. In 2024, the SEC took on climate change. See 89 Fed. Reg. 21668, 21683 (requiring "Climate-Related Disclosures" in SEC filings). That same year, the FTC sought to ban nearly all employee noncompete agreements nationwide. 89 Fed. Reg. 38342. And then there's

_____

[1] Some of these agencies, like the Securities and Exchange Commission and the Federal Election Commission, do not even have formal statutory removal protections. But in practice, that has generally proved no bar to their independence until today. See, *e.g.*, *PHH Corp.* v. *Consumer Financial Protection Bureau*, 881 F. 3d 75, 90 (CADC 2018) (en banc) (taking for granted the "traditional for-cause protection enjoyed by the SEC Commissioners").

late-night comedy. Last year, taking objection to a network host's on-air remarks, the Chairman of the FCC suggested there would be "additional work . . . ahead" for the agency if broadcasting companies did not "find ways to . . . take action." The Benny Show, Sept. 17, 2025 ("[W]e can do this the easy way or the hard way").

Some independent agencies even have *de facto* authority to create new crimes. By the 1990s, one scholar estimated that "over 300,000 federal regulations," many of them adopted by independent agencies, "may be enforced criminally." J. Coffee, Jr., Does "Unlawful" Mean "Criminal"?: Reflections on the Disappearing Tort/Crime Distinction in American Law, 71 B. U. L. Rev. 193, 216 (1991). More recent and exact totals are hard to come by—some say there may be simply too many regulatory crimes to count. See *id.*, at 218.

Over time, Congress has afforded agencies not just sweeping legislative powers but judicial ones as well, including the power to decide cases and controversies affecting Americans' private rights. We have recently begun addressing whether some of these schemes comply with Article III's assurance of an independent judge, the Seventh Amendment's promise of a jury trial, and the Due Process Clause's guarantee of a fair trial before a fair tribunal. See *SEC* v. *Jarkesy*, 603 U. S. 109, 123–126 (2024); see also *id.*, at 141 (GORSUCH, J., concurring). Even so, certain of those schemes persist. See, *e.g.*, *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 447–450, 461 (1977).

Would Congress have gone so far down this road, delegating so much legislative and judicial power to agencies, without *Humphrey's* assurance that their leaders would enjoy protection against at-will presidential removal? Maybe. After all, Congress has also granted expansive authorities to various "executive" agencies whose heads have been subject to at-will presidential removal all along. But very

possibly not. *Humphrey's* itself described removal protections as "essential" to the FTC's structure. 295 U. S., at 625. Ms. Slaughter cites evidence that "'[a]t no point was it proposed that [an FTC] ought to be set up unless it be independent.'" Brief for Respondent 5 (quoting R. Cushman, The Independent Regulatory Commissions 188 (1941)). Over the years, many commentators have offered similar assessments. See, *e.g.*, Landis 111 (noting "a correlation between the creation of the independent agency and broad grants of administrative power"); M. Bernstein, Regulating Business by Independent Commission 148–149 (1955) (observing that many delegations "might not have been enacted if Congress had not been able to delegate regulatory duties to agencies somewhat removed from continuing presidential guidance"). My dissenting colleagues share the same view too. See *post,* at 35–36.

## II

### A

The Court's decision today may take aim at removal protections and, in that way, one part of Wilson's vision. But, as we have seen, other parts never fully materialized. It was never the case that neutral experts alone led the agencies Congress created. And it was never true that those agencies were entirely insulated from politics or even presidential influence. Nor can the demise of one more vestige of Wilson's ambitions come as a surprise. As the Court persuasively explains, *Myers* was right all along and so was President Roosevelt: *Humphrey's* did "violence to the basic theory of the American Constitution," which leaves no room for a "headless 'fourth branch.'" Roosevelt Committee 36. Instead, those who exercise executive power must be accountable through a "chain of dependence" running from the "lowest officers" to "the President," and from him to the sovereign American people. 1 Annals of Cong. 499 (1789) (J. Madison). As even Wilson and Landis acknowledged,

their plans for a new scheme of "public administration" always stood in more than a little tension with the Constitution's design.

But if today's decision represents an important step back toward the Constitution, it's also worth considering the implications it holds for the last remaining pillar of Wilson's plan. Apparently relying on the assumption that it can afford their leaders some protection against presidential removal, Congress has not just assigned executive law-enforcement power to independent agencies. It has delegated extensive lawmaking and adjudicative functions to them as well. Today's decision may not have occasion to address those delegations directly, but it carries weighty consequences for them. Open-ended delegations of legislative power have not gone away; now they will just be exercised by agency officials who answer to the President. The power to write new regulatory crimes still exists, but now the pen ultimately rests in the President's hand. The ability to judge disputes in-house remains, but now the house is white.

The whole of the President's authority also may be greater than the sum of its parts. It would be one thing if today's decision afforded the White House more control over the airwaves. Or financial markets. Or energy. But Presidents now will enjoy waxing authority over all those areas and more. A business out of favor with the party in control of the White House might be able to stave off an FCC investigation. But can it survive a subsequent FTC rule declaring unlawful one of its longstanding trade practices? What about an in-house adjudication by OSHA? Or a prosecution for a new crime the SEC announces? Not to mention what these now-coordinated powers could do to disfavored individuals who lack the resources needed to fend off such attacks. It may be true that after today there is no more "fourth branch" of government. But the fourth branch's

powers still exist; they have just been reassigned to the President.

If all that weren't enough, Presidents have many other ways to consolidate their influence over agencies—both traditional executive agencies and now-formerly independent ones. Take just a couple examples. For decades, Presidents have employed the Office of Information and Regulatory Affairs (OIRA) to oversee proposed executive agency actions that carry significant economic impacts. See, *e.g.*, Exec. Order No. 12291, 3 CFR 127 (1981 Comp.); Exec. Order No. 12866, 3 CFR 638 (1993 Comp.). And even before today's decision, the President has extended OIRA review to many independent agencies. Exec. Order No. 14215, 90 Fed. Reg. 10447 (2025). Separately, Presidents can sometimes adjust the reach of the civil service laws. While those laws ordinarily afford rank-and-file agency employees considerable protection against removal, see 5 U. S. C. §§7511–7513, they do not apply to certain employees who hold positions "of a confidential policy-determining, policy-making or policy-advocating character," §7511(b)(2). And by classifying more and more positions as subject to this exception, Presidents can seek to exert greater control over not just agency leaders but their subordinates as well. See, *e.g.*, 91 Fed. Reg. 5580, 5628, 5650 (2026) (subjecting "tens of thousands" of additional positions, in both executive and independent agencies, to this exception).

So, yes, those who exercise executive power must be ultimately answerable to the President and, through him, to the American people. But while electoral accountability is a good thing, it cannot be the only thing. And allowing Presidents to control not only executive functions, but also vast new reservoirs of legislative and judicial powers, risks inviting exactly what those who framed our Constitution feared: the "accumulation of all powers . . . in the same hands, whether of one, a few or many, and whether hereditary, self appointed, *or elective.*" The Federalist No. 47,

p. 324 (J. Cooke ed. 1961) (J. Madison) (emphasis added). No nation, after all, can expect happy results when "the legislative and executive powers are united in the same person"—or, one might add, when judicial powers are added to that union. *Id.*, at 325 (internal quotation marks omitted).

## B

If allowing so much legislative and judicial power to accumulate in the President's hands invites real risks, the question becomes: Who will address them?

At first blush, the most natural answer might seem Congress. Aware now that the premise on which it apparently proceeded was flawed—independent agencies are not so independent after all—Congress might wish to reconsider how much power should remain in the President's hands. But if that seems a straightforward solution, there's a straightforward problem with it. Of course, Congress still possesses tools—most notably its appropriations authority—to "influence how the President exercises" his legislative and judicial functions. *Learning Resources* v. *Trump*, 607 U. S. 229, 271 (2026) (GORSUCH, J., concurring). But "[a]ny President keen on his own authority . . . will have a strong incentive to veto" any effort to reclaim those powers. *Id.*, at 270–271. The consequence is a ratchet effect: Authorities Congress once delegated by a simple majority may now require a veto-proof supermajority to retrieve.

Perhaps, then, if any real response is to come it will have to come from this Court. And that's hardly unfair. To be sure, Congress had a hand in creating the problem we now face. But this Court bears responsibility as well. It was this Court that decided *Humphrey's*. It was this Court that sat by while Congress delegated vast legislative and judicial powers to one independent agency after another. And it is this Court that today allows the President to remove those agencies' leaders and exercise effective control over

all their powers.  If the task of fixing a problem belongs to
those who made it, this Court has some work to do.

Fortunately, the Constitution provides the blueprint for
the job ahead.  That charter provides a far surer and more
democratically legitimate scheme of "public administra-
tion" than anything Wilson conjured up.  With the assent of
the governed, and subject to amendment by them alone, our
Constitution created three branches of government—not
four, and not just one led by the President either.  Each
branch bears the authority and responsibility to exercise
distinct powers.  Congress must make the laws that govern
us, the executive branch must faithfully execute those laws,
and independent judges and juries must decide disputes
that arise under them.

Fortunately, too, this Court already has many doctrines
designed to protect the Constitution's separation of powers.
Just as today's decision holds that Article II requires those
who exercise executive power to answer to an elected Pres-
ident, this Court's nondelegation doctrine recognizes that
Article I vests "[a]ll" federal legislative power in Congress
and no one else.  See Art. I, §1.  Of course, Congress can
enlist experts to advise it in its work and leave implemen-
tation details to others, but the doctrine holds that Con-
gress alone can make laws regulating private conduct.  See,
*e.g.*, *Panama Refining Co.* v. *Ryan*, 293 U. S. 388 (1935).  By
that doctrine's side stands the major questions doctrine,
which teaches that, to sustain a claim that Congress has
delegated to it some "[e]xtraordinary" regulatory power, an
agency must identify "clear" statutory authority for that
power.  *West Virginia* v. *EPA*, 597 U. S. 697, 723 (2022) (in-
ternal quotation marks omitted).  Vagueness doctrine can
contribute too, with its lesson that "Congress, rather than
the executive or judicial branch, [must] define what conduct
is sanctionable and what is not."  *Sessions* v. *Dimaya*, 584
U. S. 148, 156 (2018) (opinion of KAGAN, J.).  And our doc-
trines addressing Article III, the Due Process Clause, and

the Seventh Amendment can help ensure that adjudications of private rights take place where they belong, before independent judges and juries. See *Jarkesy*, 603 U. S., at 141 (GORSUCH, J., concurring).

We have, then, no shortage of tools. The only real question is whether we will use them. Yes, we often recite, the Constitution contains "a bar on [the] delegation" of "[l]egislative power" to agencies. *FCC* v. *Consumers' Research*, 606 U. S. 656, 672 (2025). But we have sometimes shrunk from applying that rule, worried that "our increasingly complex society" cannot manage unless someone else assumes Congress's job of making the laws that govern us. *Mistretta* v. *United States*, 488 U. S. 361, 372 (1989). Yes, we say, when agencies claim "[e]xtraordinary" delegated power, they "must point to clear congressional authorization for" it. *West Virginia*, 597 U. S., at 723 (internal quotation marks omitted). But some have also suggested the major questions doctrine might be tainted by an "anti-administrative-state stance," one that could prevent the "people . . . found in agencies" "from doing important work." *Id.*, at 779–781 (KAGAN, J., dissenting). And, yes, all agree that the Seventh Amendment guarantees a jury in suits at common law. But it can also seem to some that Congress occasionally has "good reaso[n]" to let agencies decide cases anyway given their "greater efficiency and expertise." *Jarkesy*, 603 U. S., at 202 (SOTOMAYOR, J., dissenting).

Whatever merit these objections once might have held, they now speak to a bygone era. As my dissenting colleagues see it, removal protections were "centrally important," or perhaps even "'essential,'" to Congress when it decided to create so many independent agencies and delegate so much legislative and judicial power to them. *Post,* at 36 (quoting *Humphrey's*, 295 U. S., at 625). On their account, Congress gave all that power to "specialists" in independent agencies "precisely because [they were] not fully controlled by the White House." *Trump* v. *Wilcox*, 605 U. S.

___, ___ (2025) (KAGAN, J., dissenting from grant of application for stay) (slip op., at 6).  But now removal protections are a thing of the past, and the President enjoys direct control over independent and executive agencies alike.  So even if entrusting legislative and judicial powers to insulated, independent agencies once seemed a good idea to some, it's simply not an option anymore.  Now, we face only two ways forward:  Let Presidents exercise all those powers or begin subjecting them to the Constitution's constraints.

\*

The Court today takes a notable step back toward the Constitution.  By recognizing that the President is entitled to remove a principal officer who exercises executive power in his name, the Court does much to vindicate what Franklin D. Roosevelt and James Madison both understood:  Under our Constitution, executive power does not belong to a "headless 'fourth branch,'" Roosevelt Committee 36, but must be exercised through a "chain of dependence" running from "the lowest officers" to "the President," and from him to the American people, 1 Annals of Cong. 499 (J. Madison).

At the same time, it would be a grave mistake to think that step is enough on its own.  The fact remains that Congress has endowed formerly independent agencies not just with executive authority, but with enormous legislative and judicial powers as well.  And now the President enjoys control over all those powers too.  From here, the only sure path is to finish the journey we start today and restore legislative and judicial powers to where they belong: in Congress and the courts.  We have tolerated adventurous theories long enough.  It is time to return, all the way, to the Constitution.

# SUPREME COURT OF THE UNITED STATES

———————

No. 25–332

———————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS *v.* REBECCA KELLY SLAUGHTER

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

For most of this Nation's history, Congress and the President together have decided that some Government functions should operate at a distance from partisan politics. Those include the management of nuclear energy; the security of the monetary supply; and the safety of American workplaces, consumer products, and chemical hazards. In these and many other areas, the wisdom of the centuries has taught that some decisions should depend not only on who is in office—much less on who is disfavored or owed a favor by those in office—but also on judgment, expertise, and the public good.

Since the founding, Congress has created agencies that in various ways have embodied this goal of independence. Over the last 140 years especially, the political branches have done so by establishing agencies like the Federal Trade Commission (FTC): bipartisan, multimember bodies with "for-cause" removal protections. This structure allows the agencies to address complex problems while enjoying some independence from Presidential removal and thus absolute partisan control. More than 90 years ago, this Court affirmed,     as     to     the     FTC     specifically,     that     the

constitutionality of its members' "for cause" removal protections "cannot well be doubted." *Humphrey's Executor* v. *United States*, 295 U. S. 602, 629 (1935). Ever since, Congress and more than a dozen Presidents have relied on *Humphrey's* to construct a workable Government, creating many other agencies in the FTC's tradition.

Today, this Court undoes centuries of political practice and concludes that all three branches of Government have been acting in open defiance of the Constitution all this time. Its conclusion is wrong. The text of the Constitution, along with its history, the longstanding practices of the political branches, and the precedents of this Court, make clear that Congress may limit the causes for which the heads of Commissions like the FTC can be removed by the President. In holding otherwise, the Court gives the President a power unknown even to the English Crown against which the Founders revolted, elevating him above his once-coequal branches by transforming a duty to take care that the laws be faithfully executed into a license to act in defiance of those very laws. If nothing else, the doctrine of *stare decisis*, which today's decision cursorily dismisses, should have made this a profoundly easy case under *Humphrey's*.

Perhaps worst of all, the Court today forgets its place. For most of our history, the Court has rightly left the removal question primarily to its coequal branches. Today's majority, however, decides that it knows better: better than members of the founding generation who created agencies, like the Sinking Fund Commission and the Bank of the United States, free from unfettered Presidential control; better than a century and a half of Congresses and Presidents, starting with Grover Cleveland and continuing into the 21st century, who created agencies in the FTC's mold; better than even Hamilton, Story, Webster, Holmes, Brandeis, Frankfurter, and Rehnquist. These statesmen and Justices knew something that today's majority apparently does not: that fealty to the Constitution means

respecting not just what it says, but what it does not say and by its silence leaves to others to decide. It also means respecting precedent—not as a wooden exercise, but out of a recognition that, whatever our confidence in the theories of the present moment, the wisdom of our founding document does not belong to today's Justices alone. Because the Court ignores these foundational tenets, and in doing so upends rather than upholds the separation of powers, I respectfully dissent.

## I

In 1914, Congress enacted the Federal Trade Commission Act, which established the FTC primarily to prevent "unfair methods of competition in commerce." 38 Stat. 719, as amended, 15 U. S. C. §41 *et seq*. Then, as today, the Commission included five Commissioners appointed by the President and confirmed by the Senate; no more than three Commissioners at a given time could be from the same political party; the Commissioners generally served staggered 7-year terms; and, central here, the Commissioners could be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office." 38 Stat. 717–718, 15 U. S. C. §41. At the time of enactment, the Commissioners elected their own Chair from among their membership. 38 Stat. 718. Today, the President appoints the Chair. See §41; 16 CFR §0.8 (2025).

In 2018, President Trump nominated, and the Senate unanimously confirmed, Democrat Rebecca Slaughter to serve as an FTC Commissioner. In 2024, Slaughter was reconfirmed to serve a second term. In January 2025, soon upon assuming office, President Trump exercised his statutory authority to designate Andrew Ferguson as the new FTC Chair, 15 U. S. C. §41, and (as is customary) the former Chair who had served under President Biden resigned her seat. At that point, the FTC was split down the middle with two Democratic and two Republican Commissioners.

While the nomination of the President's choice to replace the Chair was pending before the Senate in March 2025, he fired the two remaining Democratic Commissioners, including Slaughter, leaving only the two Republican Commissioners. He did not identify any "inefficiency, neglect of duty, or malfeasance in office" on either removed Commissioner's part. *Ibid.* Instead, he simply asserted that these Commissioners were removed pursuant to the President's "authority under Article II of the Constitution." App. 28.

Slaughter sued, and the District Court granted her motion for summary judgment, holding that "the law on the removal of FTC Commissioners is clear" under *Humphrey's* and prohibits Slaughter's removal without cause. 791 F. Supp. 3d 1, 6 (DC 2025). The Court of Appeals denied the Government's request for a stay, holding it "highly unlikely to succeed on appeal because th[e] exact question" presented in this case "was already asked and unanimously answered by the Supreme Court adversely to the government's position 90 years ago in *Humphrey's Executor*." 2025 WL 2551247, \*2 (CADC, Sept. 2, 2025). This Court, however, granted a stay and then certiorari before judgment, permitting Slaughter's removal. 606 U. S. 1051 (2025). Today, the FTC has only two remaining Commissioners.

## II

Six years ago, this Court announced that the President generally must be able to fire executive officials "at will" (that is, for any reason or even no reason at all). *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 204–205 (2020). In so holding, the Court recognized "two exceptions" to that "general rule" of "unrestricted removal power," *id.*, at 215: one for inferior officers and one that allowed Congress to "create expert agencies led by a group of principal officers removable by the President only for good cause," *id.*, at 204 (emphasis deleted). Today, the Court doubles back on the second exception for agencies like

the FTC, and doubles down on its "general rule" that the President's removal power cannot be cabined in any way. Its decision is grievously wrong.

### A

#### 1

This case should have begun and ended with this Court's unanimous decision from almost a century ago: *Humphrey's Executor* v. *United States*, 295 U. S. 602. *Humphrey's* addressed the very statute at issue here, which allows the President to remove FTC Commissioners only "'for inefficiency, neglect of duty, or malfeasance in office,'" and upheld its constitutionality against the very same challenge levied in this case. *Id.*, at 620; see *id.*, at 629, 631–632.

In reaching that conclusion, the Court focused on the FTC's "character." *Id.*, at 629, 631. The FTC, the Court explained, is a "body of experts" tasked with "carry[ing] into effect legislative policies embodied in the [FTC Act] in accordance with the legislative standard therein prescribed," including by determining what constitutes "'unfair methods of competition.'" *Id.*, at 624, 628. The agency thus was not purely executive; instead, it "act[ed] in part quasi-legislatively and in part quasi-judicially" by "filling in and administering the details embodied [in the law's] general standard." *Id.*, at 628. "[F]rom the very nature of its duties," it was clear that the FTC "must . . . act with entire impartiality," as "[i]t is charged with the enforcement of no policy except the policy of the law." *Id.*, at 624; see *id.*, at 625 (relying on legislative history emphasizing the "advantage" to be found in the FTC's "independence" and immunity from "suspicion of partisan direction").

For an agency of this "character," the Court held that Congress permissibly could forbid Presidential "removal except for cause." *Id.*, at 631–632. Given the FTC's role in "carrying into operation" Congress's legislative goals, it needed some independence from Presidential domination.

*Id.*, at 630. It was "quite evident" to the Court, moreover, "that one who holds his office only during the pleasure of another . . . cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.*, at 629. Indeed, the Court explained, James Madison had suggested much the same thing when discussing the office of the Comptroller of the Treasury in 1789. See *id.*, at 631 (citing 1 Annals of Cong. 611–612 (1789)). For executive officers whose duties "partak[e] strongly of the judicial character," Madison explained, "there may be strong reasons why an officer of this kind should not hold his office at the pleasure of the Executive branch." 1 Annals of Cong. 612. For the FTC too, the Court held, removal protections complied with the Constitution. *Humphrey's*, 295 U. S., at 631–632.

As Congress constructed a variety of agencies to serve the public's needs over the decades that followed, see *infra*, at 10–11, this Court repeatedly applied and expanded the rule announced in *Humphrey's*. In *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952), *Humphrey's* was the only example Justice Jackson provided of a case in which the President's "power [wa]s at its lowest ebb" and the President was thus prevented from "tak[ing] measures incompatible with the expressed or implied will of Congress." 343 U. S., at 637–638, and n. 4 (concurring opinion). Later, in *Wiener* v. *United States*, 357 U. S. 349 (1958), Justice Frankfurter's opinion for a unanimous Court relied on *Humphrey's* (describing it as a "*cause célèbre*") to approve removal protections for the War Claims Commission, which settled claims by American prisoners of war and civil internees who suffered harm during World War II. 357 U. S., at 350, 353, 356. The Court explained that "the essence of the decision in Humphrey's case" was that certain Government officials, depending on their "function," require and may be given independence "'to exercise [their] judgment without the leave or hindrance of any other official.'" *Id.*, at 353 (quoting *Humphrey's*, 295 U. S., at 625–626).

In later decades, the Court reaffirmed *Humphrey's* rule that certain executive officers may enjoy for-cause protections. In *Morrison* v. *Olson*, 487 U. S. 654 (1988), Chief Justice Rehnquist, writing for a 7-to-1 Court, applied and expanded *Humphrey's* in a new context, approving removal protections for an independent counsel tasked with investigating allegations of crime by high executive officers. 487 U. S., at 688–691. Rejecting the idea that the only officers who could permissibly be granted removal protections were those who exercised "'quasi-legislative'" or "'quasi-judicial' powers," the Court held that the more fundamental question was whether removal protections unduly "interfere[d] with the President's exercise of the 'executive power.'" *Id.*, at 688–690. Still, the Court explained, *Humphrey's* "analysis of the functions served by the officials at issue" remains "[r]elevant" to answering that question. 487 U. S., at 691. Considering the "functions of the" independent counsel, alongside the President's remaining ability to exercise control over the office, the Court held that the for-cause removal statute at issue was constitutional. *Id.*, at 691–692.

Even in more recent cases in which the Court has declined to "extend *Humphrey's* to a 'new situation,'" *ante*, at 20, the Court has underscored that *Humphrey's* remains good law in its core application to multimember bodies like the FTC, see *Seila Law*, 591 U. S., at 215–218; *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 483 (2010). In *Seila Law*, for instance, the Court held that removal protections were incompatible with an agency headed by a single director (rather than a multimember commission). 591 U. S., at 218–219. Even so, the principal opinion explicitly suggested that Congress could fix that problem by "converting" the single-headed Consumer Financial Protection Bureau, with all of the powers it possessed, "into a multimember agency" just like the FTC that *Humphrey's* had addressed. 591 U. S., at 237 (opinion of ROBERTS, C. J., joined by ALITO and KAVANAUGH, JJ.).

Searching for a distinction, the Government (echoed by the majority) contends that *Humphrey's* should not control as to the present-day FTC because the FTC's powers have expanded over the years since *Humphrey's* was decided. See Brief for Petitioners 25–28; *ante*, at 25–27. The premise that the FTC has fundamentally changed, however, is untrue: Contrary to the Government's assertions, the FTC of 1935, like today's FTC, had the power to conduct investigations, make rules, and bring enforcement actions. See Federal Trade Commission Act, 38 Stat. 719–723.[1] To the extent the FTC has gained power since 1914 (for example, the Government cites its ability to seek civil penalties, see Brief for Petitioners 25–26), those changes at the margins do not so transform the "character of the office" as to bring the agency outside of *Humphrey's* rule. 295 U. S., at 631. If, it was true that the political branches went too far in assigning certain powers to the FTC over the years, moreover, it is unclear why the appropriate remedy at this point would not be to sever these additional, objectionable powers. Cf. *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 24–25 (2021) (opinion of ROBERTS, C. J.) (remedying Appointments Clause violation by altering the officers' powers); see also *id.*, at 44 (Breyer, J., concurring in judgment in part and

---

[1] *Humphrey's* did not explicitly identify each power, but the idea that "a court including Charles Evans Hughes, Louis Brandeis, Benjamin Cardozo, and Harlan Stone somehow misunderstood [the FTC's] powers lacks all plausibility." *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 287, n. 10 (2020) (KAGAN, J., concurring in judgment with respect to severability and dissenting in part) (citation omitted). It is also true that, despite these powers existing at the time, *Humphrey's* described the FTC as sharing "no part of the executive power." 295 U. S., at 625, 628; see *ante*, at 18–19, 21, 33–34 (highlighting this point). For decades, however, this Court has recognized that even for agencies exercising powers that "would at the present time be considered 'executive,'" *Humphrey's* rule applies. *Morrison* v. *Olson*, 487 U. S. 654, 689–690, and n. 28 (1988). Congress, even before *Morrison*, extensively legislated, creating many agencies like the FTC, based on that understanding. See *infra*, at 10–11, 35–38.

dissenting in part) (joining this remedial holding). There then would be no need to adopt a sweeping new rule that will transform the balance of power across the Federal Government and deprive the public of Government impartiality in serving the public's needs. See *infra*, at 35–38.

Far from the minimal impact that the majority imagines *Humphrey's* to have had, *ante*, at 18–21, *Humphrey's* has sat at the center of this Court's separation-of-powers jurisprudence for nearly a century. If precedent were any guide, this case would be open and shut: The FTC's removal protections, as the Court has long held and repeatedly recognized, are constitutional.[2]

2

*Humphrey's* is not just a longstanding precedent of this Court. It also reflects a "deeply rooted tradition" embraced by all three branches of Government and the American people. *PHH Corp.* v. *Consumer Financial Protection Bureau*, 881 F. 3d 75, 177 (CADC 2018) (Kavanaugh, J., dissenting).

Such "longstanding practice" is entitled to "'great weight'" in separation-of-powers cases like this one. *Trump* v. *Mazars USA, LLP*, 591 U. S. 848, 862 (2020). On "doubtful question[s]" regarding the meaning of the Constitution, historical practice, when "deliberately established" through "legislative acts," can "put at rest" the Constitution's meaning. *McCulloch* v. *Maryland*, 4 Wheat. 316, 401 (1819); see *ante*, at 9. That is so even for practices that "began after the founding era." *NLRB* v. *Noel Canning*, 573 U. S. 513, 525 (2014).[3] As Justice Scalia explained, constitutional

---

[2] The majority also attacks *Humphrey's* reasoning and compatibility with later decisions. See *ante*, at 16–21. These arguments, flawed as they are, may be relevant to the *stare decisis* analysis, see *infra*, at 34–47, but they cannot change the fact that, until now, *Humphrey's* squarely controlled.

[3] See, *e.g.*, *Noel Canning*, 573 U. S., at 528–529 (relying on practices beginning after the Civil War); *Mistretta* v. *United States*, 488 U. S. 361,

interpretation should reflect "the principles adhered to, over time, by the American people, rather than those favored by the personal (and necessarily shifting) philosophical dispositions of a majority of this Court." *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 96 (1990) (dissenting opinion). Like a "more democratic" form of *stare decisis*, respecting historical practice "promotes . . . stability, equality, and predictability." M. McConnell, Time, Institutions, and Interpretation, 95 B. U. L. Rev. 1745, 1776 (2015).

These principles apply with full force here. Today's decision addresses one of the oldest, most vigorously debated questions in constitutional law. See *infra*, at 18–24. Fifty years before *Humphrey's* was decided, Congress and the President began to reach a settled answer to that question, at least as to multimember agencies like the FTC. In 1887, as the railroads grew in strength across the American economy, Congress responded by creating the Interstate Commerce Commission (ICC), a powerful new agency with five Commissioners, appointed by the President by and with the consent of the Senate, who were removable only "for inefficiency, neglect of duty, or malfeasance in office." Act of Feb. 4, 1887, 24 Stat. 383. Three years later, Congress established the nine-member Board of General Appraisers to regulate American customs and granted it the same form of removal protection. Act of June 10, 1890, 26 Stat. 136; see A. Bamzai, Taft, Frankfurter, and the First Presidential For-Cause Removal, 52 U. Rich. L. Rev. 691, 694–695 (2018) (describing this Board as "one of the most powerful entities within the federal government" at the time). The

_____

390 (1989) (relying on "more than a century" of experience); *Ex parte Grossman*, 267 U. S. 87, 118 (1925) (relying on "long practice" since 1841); see also *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 327–328 (1936) (explaining that "[a] legislative practice . . . marked by the movement of a steady stream for a century and a half of time goes a long way in the direction of proving the presence of an unassailable ground for the constitutionality of the practice").

Federal Reserve Board followed with similar removal pro-
tections in 1913.  Act of Dec. 23, 1913, 38 Stat. 260–261.
The next year, Congress created the FTC with removal pro-
tections aimed at ensuring "a continuous policy," "free from
the effect of . . . changing [White House] incumbency."  51
Cong. Rec. 10376 (1914).

From here, "many more . . . for-cause removal provisions
followed."  *Seila Law*, 591 U. S., at 275–276 (opinion of
KAGAN, J.).  Today, dozens of agencies are headed by com-
missioners or board members removable only for cause.  *Id*.,
at 276; see J. Manners & L. Menand, The Three Permis-
sions: Presidential Removal and the Statutory Limits of
Agency Independence, 121 Colum. L. Rev. 1, 74–79 (2021)
(Manners & Menand) (collecting additional agencies).
Thus, unlike in other recent cases, in which the Court con-
sidered agencies that it deemed "historical anomal[ies]"
with "no foothold in history or tradition," here history and
tradition point in the opposite direction.  *Seila Law*, 591
U. S., at 222; see *Free Enterprise Fund*, 561 U. S., at 505.

Congress, moreover, has taken this action not only with
the Executive Branch's "acquiesce[nce]," but also with the
active participation of Presidents across the ideological
spectrum.  *Zivotofsky* v. *Kerry*, 576 U. S. 1, 23 (2015); see
also, *e.g.*, *United States* v. *Midwest Oil Co.*, 236 U. S. 459,
473 (1915) (endorsing the "wise and quieting rule that in
determining . . . the existence of a power, weight shall be
given to the usage itself—even when the validity of the
practice is the subject of investigation").  President Lincoln,
even before the creation of the ICC in 1887, "asked Con-
gress to establish" a Comptroller of the Currency and then
signed the bill enacting that office into law even though it
restricted the President's power to remove the Comptroller.

*Seila Law*, 591 U. S., at 274 (opinion of KAGAN, J.).[4]  In fact, other than Humphrey's own removal, the Government struggles to find any Presidential objections to, let alone repudiations of, for-cause removal protections like the FTC's since they came into existence in the late 1800s.  See Reply Brief 10–11 (noting one Presidential signing statement "questioning" removal protections but still signing them into law).  Even if *Humphrey's* had never been decided, this longstanding practice, jointly undertaken by Congresses and Presidents, should be entitled to significant weight.

The majority's only response is *INS* v. *Chadha*, 462 U. S. 919 (1983), which held unconstitutional a 50-year-old procedure by which a single House of Congress could override an executive action.  See *ante*, at 33.  *Chadha*, however, is no model for today's decision.  For one thing, *Chadha* did not involve a practice that had been repeatedly approved by this Court for nearly a century.  Moreover, *Chadha* rested on "[e]xplicit and unambiguous provisions of the Constitution" (specifically, Article I's bicameralism and presentment requirements) in disapproving the challenged practice.  462 U. S., at 945.  The majority here, by contrast, identifies no constitutional provision referencing or requiring an unfettered removal power.  See *infra*, at 14–18.  Instead, it rests heavily on structural inferences, legislative inaction, congressional debates, legal commentary, and private correspondence.  See *ante*, at 9–13.  Thus, unlike *Chadha*, this case does not ask whether 50 years of practice can overcome plain constitutional text.  It asks whether the Constitution privileges the majority's flawed historical account as the final word on the subject, impervious to more than a century of later historical development.

_____

[4] The majority suggests that it is unlikely that President Lincoln would have supported a bill limiting his own removal power, see *ante*, at 32, n. 8, but that flies in the face of the fact that he did sign this bill into law without objection.  Nor does the fact that Congress later repealed this law erase the historical record of Lincoln's actions.  *Ibid.*

The answer is no. Although the majority suggests that its view reflects a settled construction of the Constitution, the opposite is true. For more than a century, the Nation has firmly rejected the majority's view and has recognized that Congress, not this Court, has primary say over whether multimember commissions like the FTC should have some insulation from direct Presidential control. It is thus the majority, not *Humphrey's* or the FTC, that improperly "transform[s] the 'established practice' of the political branches." *Mazars*, 591 U. S., at 867.

B

Ninety years of precedent and 140 years of consistent political practice should have been more than enough to resolve this case. They are not enough, however, for the majority. Instead, the majority disregards "a venerable and accepted tradition" after placing it "on the examining table" and "scrutiniz[ing] its conformity to" the majority's own "abstract" theory of unitary executive control. *Rutan*, 497 U. S. 62, at 95–96 (Scalia, J., dissenting).

There is no need for this renewed analysis, but even if we must return to fundamentals, the majority remains deeply wrong. Until 2010, this Court had generally allowed Congress to impose reasonable limits on the President's default power to remove Executive Branch officials if doing so did not impair his ability to perform his constitutional duties. See *Free Enterprise Fund*, 561 U. S., at 515–516, 532–533 (Breyer, J., dissenting). Recently, however, the Court has seized the issue from the political branches by fashioning a "general rule" of mandatory, illimitable at-will Presidential removal. *Seila Law*, 591 U. S., at 215. From the start, the majority's theory rested on shaky ground. Over time, its arguments have grown weaker still, as historical evidence has undermined key pillars of its theory. Today, the Court faced a choice: plow ahead, or acknowledge that the foundations on which the "general rule" of illimitable removal

power rests are less stable than the Court has previously asserted. Unfortunately, the Court repeats and expands upon several prior errors that require correction.

1

Beginning at the founding, there is no evidence that those who shaped or ratified the Constitution adopted the majority's general rule of at-will removal. Indeed, the Court has long noted that, for the most part, "[t]he Constitution is silent with respect to the power of removal from office, where the tenure is not fixed." *Ex parte Hennen*, 13 Pet. 230, 258 (1839). The one exception, and only explicit removal power granted in the Constitution, is for impeachment of the "President, Vice President, and all Civil Officers," a power placed in Congress's hands, not the President's. See Art. I, §3, cls. 6–7; Art. II, §4.

Still, the majority begins by claiming that its theory of Presidential removal comes from Article II's "vest[ing of] '[t]he executive Power'" in the President. *Ante*, at 1, 4 (quoting Art. II, §1, cl. 1). That assertion begs the question. Does the "executive Power," in fact, contain an illimitable removal power beyond Congress's power to "establis[h] by Law" certain offices, as "necessary and proper" to structure the Executive Branch? Art. I, §8, cl. 18; Art. II, §2, cl. 2. After all, agencies like the FTC would not even exist if not for Congress's exercise of its Article I power to create them.

There is little to suggest that "executive Power," as understood at the time of the founding, was as capacious as the Court today asserts. The powers held by the English Crown and state governors before ratification did not include a removal power that the legislature could not modify. Instead, Parliament often restricted the Crown's ability to remove even high-level royal officers, and States with vesting clauses like the Constitution's similarly allowed for limits on gubernatorial removal powers. See *Seila Law*, 591

U. S., at 267–268 (opinion of KAGAN, J.).  Recent, post-*Seila Law* scholarship overwhelmingly confirms this point.[5]

Nor is there evidence that the Constitution was intended to give the President more expansive removal powers than those enjoyed by the Crown.  For good reason: Doing so would have been inconsistent with the Constitution's very foundation.  The Framers "never intended" to give the President "the complete set of powers" that the English Crown held, let alone more.  C. Chabot, Interring the Unitary Executive, 98 Notre Dame L. Rev. 129, 140 (2022) (Chabot).  They carefully parsed the "'royal prerogative[s]'" and assigned many, including the power of office creation, to Congress.  *Ibid.*; see G. Lawson, Command and Control: Operationalizing the Unitary Executive, 92 Ford. L. Rev. 441, 442–443 (2023) (Lawson) (explaining that the Constitution's vesting of the power to create offices in Congress was a "monumental change from English practice").

Removal also "was not discussed in the Constitutional Convention," *Myers* v. *United States*, 272 U. S. 52, 109–110 (1926), making an expansion of preratification executive power unlikely.  Alexander Hamilton, then writing to support the States' ratification of the Constitution, explained that because the power to remove traditionally followed the power to appoint, "[t]he consent of [the Senate] would be necessary to displace as well as to appoint."  The Federalist No. 77, p. 458 (C. Rossiter & C. Kesler eds. 1999).  This was a selling point for the Constitution, as it meant that "[a] change of the [President] would not occasion so violent or so

——————

[5] See, *e.g.*, A. Bamzai & S. Prakash, The Executive Power of Removal, 136 Harv. L. Rev. 1756, 1790 (2023) (acknowledging that "parliamentary laws [could] nullify the common backdrop of at-pleasure removal"); Manners & Menand 18–21 (collecting English and early American removal limits); J. Shugerman, Venality: A Strangely Practical History of Unremovable Offices and Limited Executive Power, 100 Notre Dame L. Rev. 213, 216–218 (2024) (In England, "many high offices, and even 'great offices,' department heads, and cabinet-level offices were unremovable" by the Crown).

general a revolution in the officers of the government as might be expected if he were the sole disposer of offices." *Ibid.*[6] Madison also explained that "[t]he tenure of the ministerial offices, generally, will be a subject of legal regulation, conformably to the reason of the case and the example of the State constitutions." *Id.*, No. 39, at 238.

The Constitution may have been intended, as the majority argues at length, to "forg[e] a new path," in contrast to some state governments at the time, by "opting for one President" and not a "'committee-style'" Presidency. See *ante*, at 1–2, 4–9. This new path, however, does not lead where the majority wishes to go. Whether executive power vests in a single President or a council, the question remains whether the Vesting Clause forecloses any limitations on that person's (or body's) power to remove subordinate officials. For proof, look no further than Hamilton, who certainly agreed that executive power ought to be "placed in a 'single hand.'" *Ante*, at 6 (quoting The

─────────

[6] Far from a "passing commen[t]" by Hamilton that the majority imagines this to have been, *ante*, at 29, Joseph Story later wrote that Federalist No. 77 "den[ied] the existence of the [unlimited presidential removal] power" and, in doing so, "had a most material tendency to quiet the just alarms of the overwhelming influence, and arbitrary exercise of this prerogative of the executive, which might prove fatal to the personal independence, and freedom of opinion of public officers, as well as to the public liberties of the country." 3 Commentaries on the Constitution of the United States §§1533–1534, pp. 390, 392 (1833) (Story). When the political branches ultimately concluded that, contrary to Hamilton, the President did have authority to remove officials without the Senate's consent, James Kent marveled at the "striking fact" that they did so based "upon inference merely" and "in opposition to the high authority of the *Federalist*." 1 Commentaries on American Law 290 (1826) (Kent). The majority's suggestion that Hamilton might have meant something entirely different in Federalist No. 77, *ante*, at 29, is also doubtful given Story's and Kent's understandings. Moreover, to the extent the majority identifies other later statements by Hamilton arguably in tension with his initial view in The Federalist, see *ante*, at 29–30, "changing minds and inconstant opinions don't usually prove the existence of constitutional rules." *Seila Law*, 591 U. S., at 270, n. 4 (opinion of KAGAN, J.).

Federalist No. 70, p. 424 (C. Rossiter ed. 1961)).  Yet Hamilton also saw this choice as entirely compatible with his view that "[t]he consent of" the Senate would be necessary "to displace as well as to appoint" officers.  The Federalist No. 77, at 458 (Rossiter & Kessler eds. 1999).  He plainly did not view "the power to remove at will [a]s a necessary corollary of the Constitution's design," *ante*, at 8, and the majority is wrong to assume that a unitary Presidency implies an unlimited removal power.

The majority relatedly places undue weight on the notion that "'[t]he power of appointing and removing executive officers [is] inherent in [the] Executive.'"  *Ibid.*  Under the Constitution, the President does not have unlimited appointment powers either.  His power is to "nominate"; only "by and with the Advice and Consent of the Senate" may he "appoint" the "Officers of the United States."  Art. II, §2, cl. 2.  What is more, the President can appoint officers only to offices "established by Law"—that is, by Congress.  *Ibid.*  Any link between appointment and removal thus undermines the existence of any inherent illimitable executive removal power.  See, *e.g.*, Lawson 452–453.  Given that the Constitution did not grant the President alone an illimitable power to appoint, it is all the less likely that it silently vested in the President an unbounded power to remove.

Nor does the Take Care Clause serve as a plausible source for the expansive removal power the majority posits.  Contra, *ante*, at 4.  "[T]he provision—'he shall take Care that the Laws be faithfully executed'—speaks of duty, not power."  *Seila Law*, 591 U. S., at 268 (opinion of KAGAN, J.) (quoting Art. II, §3).  As recent scholarship has explained, "'[f]aithful execution' was proto-fiduciary legal language from centuries of English law that limited the discretion of executive officials" and did "not expan[d] their power."  J. Shugerman, The Misuse of Ratification-Era Sources by Unitary Executive Theorists, 58 U. Mich. J. L. Reform 591, 603–604 (2025); see A. Kent, E. Leib, & J. Shugerman,

Faithful Execution and Article II, 132 Harv. L. Rev. 2111, 2120 (2019) (explaining that the original public meaning of the Take Care Clause "supports readings of Article II that tend to subordinate presidential power to congressional direction"). At-will removal might be one good way of fulfilling those duties. There is no evidence, however, that anyone understood the Take Care Clause at or near the founding to imply a mandatory, inflexible rule of at-will removal that Congress could never modify.

In sum, nothing in the text of the Constitution, as understood at the time of the founding by those who ratified it, suggests the illimitable removal power the Court today endorses. The majority can shut its eyes to this evidence and point back to its past mistakes as support for the new ones of today. See *ante*, at 20 (citing *Seila Law* and *Free Enterprise Fund*). To the extent "'[o]riginal history'" is seen as "generally dispositive," however, see *United States* v. *Rahimi*, 602 U. S. 680, 738 (2024) (BARRETT, J., concurring), this background should have prevented the Court from continuing to build on the uncertain foundation of a general rule of illimitable Presidential removal.

2

The majority quibbles with some of the evidence discussed above, but in the end cites nothing from the ratification debates or the Constitution's text endorsing its view of unbounded removal power. Instead, the majority rests mostly on postratification commentary and congressional inaction. On this score, though, the majority also comes up short. Presidential removal has long evoked strong, conflicting views from American political leaders, but the available evidence from 1789 through the end of the 19th century reflects that the political branches have long believed, and acted upon the belief, that Congress has the power to set limits on the President's removal authority and that the President was not free to flout such limits when enacted.

a

Starting where the majority starts, the debates of the First Congress over the removal process for early depart-ment heads (which culminated in the "Decision of 1789") in no way resolve the question presented here. See *ante*, at 9–11. To begin, the majority's own theory is inconsistent. If "[t]ext and structure" already "taught that the President had to be able to remove" all of his inferiors in order to "'be *personally responsible* for everything'" within the Executive Branch, *ante*, at 9, then it is unclear what was left for the First Congress to "decide," much less spend days debating. The very need for a Decision of 1789 suggests that the re-moval question was still unanswered by 1789.

In any event, the debates from 1789 do not support the majority's understanding of executive power. The House in 1789 did not address whether Congress could place limits on the President's power to remove; it debated whether the President could remove officers *at all* without Senate con-sent. "[T]he great question" in 1789 "was whether the re-moval was to be by the President alone, or with the concur-rence of the Senate." *Hennen*, 13 Pet., at 259. Some, as the majority explains, believed (as Hamilton did) that the Con-stitution required Senate consent for all removals; another group believed that Congress could choose whether to give the Senate a say; and a third believed the Constitution pro-hibited all Senate involvement in the removal process (out-side of impeachment). *Ante*, at 9–10.[7]

The one "'[d]ecision'" that emerged from this debate was that "a congressional role in the removal process was re-jected." *Bowsher* v. *Synar*, 478 U. S. 714, 723 (1986). To be clear on this, given the majority's elliptical treatment of what took place in the summer of 1789, here is what

_____

[7] A fourth, smaller group believed that impeachment alone, without re-served power to the President, was the only way to remove an executive officer. See, *e.g.*, 1 Annals of Cong. 456–457 (1789) (Rep. Smith).

actually happened: The bill the House initially debated provided that the head of the Department of Foreign Affairs would "be removable by the President."  1 Annals of Cong. 370–371.  Madison and his allies at first argued that this language should be "retain[ed] . . . in the bill" because it was "explanatory of the meaning of the Constitution" (that is, they thought it confirmed the President's power to remove), *id.*, at 464 (Madison), while the other camps opposed this language.  Several days later, however, Madison and his allies "reversed course," arguing that the language they originally favored might wrongly suggest that the President lacked any removal power unless Congress provided for it by statute.  J. Shugerman, The Indecisions of 1789: Inconstant Originalism and Strategic Ambiguity, 171 U. Pa. L. Rev. 753, 760 (2023); 1 Annals of Cong. 578 (Madison's ally, Egbert Benson, moving to amend the bill for these reasons).  Ultimately, the House settled on a vague clause detailing who would have custody of certain books and records "whenever the said principal officer shall be removed from office by the President."  Act of July 27, 1789, 1 Stat. 29.  This language assumes that the President can remove officers without an express grant from Congress and without Senate involvement.  No version of the bill debated or voted upon, however, suggested that Congress was prohibited entirely from limiting the causes for such removal.

As a result, nearly every scholar to have studied this episode, even those broadly supportive of the majority's view, has come to agree that "the Decision of 1789 did not endorse the view that Congress lacked authority to modify the Constitution's grant of removal power to the President."  S. Prakash, New Light on the Decision of 1789, 91 Cornell L. Rev. 1021, 1073 (2006); see J. Manning, Separation of Powers as Ordinary Interpretation, 124 Harv. L. Rev. 1939, 1964–1965, n. 135 (2011); see also Shugerman, 171 U. Pa. L. Rev., at 759–762.  Instead, Congress in 1789 left that question to later generations.

Fumbling for a response, the majority asserts that there is no constitutional difference between a rule against congressional participation in removals, on the one hand, and a rule against tenure protections, on the other. See *ante*, at 30 (arguing that these are "one and the same"). That is not how the Court has understood matters. The Court has long distinguished between impermissible efforts by Congress to "reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment" (the issue decided in 1789), and the permissible "power of Congress to limit the President's powers of removal of a" principal officer. *Bowsher*, 478 U. S., at 724–726. "Madison's position ultimately prevailed" in "urg[ing] rejection of a congressional role in the removal of Executive Branch officers," *id.*, at 723, but *Humphrey's* "involved an issue not presented" by that triumph, 478 U. S., at 724.

The majority also compares the President's removal power to the pardon and veto powers, suggesting that once Congress rejected the Senate's role in removals, that power became "as much outside Congress's control as" these other powers and so now "'cannot be modified, abridged, or diminished by the Congress.'" *Ante*, at 30 (quoting *Schick* v. *Reed*, 419 U. S. 256, 266 (1974)). The comparison is inapt. *Schick*'s conclusion that the pardon power is not subject to modification by Congress rested on the "history of the English pardoning power," the text of the Constitution, and "unbroken practice since 1790." 419 U. S., at 266. As explained throughout this opinion, the majority's version of the removal power, by contrast, draws no support from any of those sources. The majority's rule breaks from English practice; it derives from no constitutional text speaking of a Presidential removal power (instead, it is Congress that has power over office creation); and it is inconsistent with the bulk of the American historical tradition.

b

The majority attempts to shore up its view of the Decision of 1789 with commentary from the years that followed, but several of its own sources show its errors. The first slew of citations shows only that Senate consent was unnecessary for removal. See *ante*, at 11–12. The debate that was, in James Kent's words, "firmly and definitively settled" in 1789, was not whether at-will removal was constitutionally required, as the majority suggests; it was whether "participation in [the removal] authority by the senate" was necessary or permitted. 1 Kent 289–290. Joseph Story confirmed that the decision in which "[t]he public . . . acquiesced" was Congress's "affirm[ance] of the power of removal in the [P]resident, without any co-operation of the [S]enate." 3 Story §§1536–1537, at 394–395. Daniel Webster, too, decried the Decision of 1789 as wrongly allowing the President to remove independently, rather than "concurrently" with the Senate. 11 Cong. Deb. 466 (1835) (1835 Debates). Contrary to the majority, even by 1835, Webster still "believe[d] it to be within the just power of Congress to reverse the decision of 1789." *Id.*, at 468.

The power of the President to remove without Senate consent does not, however, mean that Congress was forbidden from placing any restraints on that power. Even Madison seems to have agreed. In 1789, he argued that for officers who "partak[e] strongly of the judicial character," "there may be strong reasons why an officer of this kind should not hold his office at the pleasure of the Executive [B]ranch." 1 Annals of Cong. 611–612; see *Humphrey's*, 295 U. S., at 631 (describing Madison's view). Others thought similarly. Asked by President Monroe whether at-will removal was permitted without explicit statutory authorization, Attorney General William Wirt answered in the affirmative, but only because "[w]henever Congress intend[s] a more permanent tenure . . . they take care to express that intention clearly and explicitly." 1 Op. Atty. Gen. 212, 213 (1818).

This shows both that Monroe did not assume an at-will re-moval power and that Wirt believed it could be curtailed.

Story did note, in 1833, that Congress had until then gen-erally left the President free to remove officers at will. It is unclear, however, if he believed Congress could provide more durable tenures of office. As the majority observes, Story suggested in a footnote that the vote in 1789 "seems to have expressed the sense of the legislature, that the power of removal by the executive could not be abridged by the legislature." 3 Story §1531, at 390, n. 1. On the prior page, though, Story identified, as an open question, "whether congress can give any duration of office . . . not subject to the exercise of this power of removal." *Id.*, §1531, at 389. Given Story's view that the "vote finally taken" in 1789 was merely "affirmative of the power of removal in the president, without any co-operation of the senate," *id.*, §1536, at 394, it is most likely that the "sense of the legis-lature" described in his footnote was the view that Congress could not insert itself into removal decisions by requiring Senate consent. The majority thus mischaracterizes Story when it attempts to enlist his equivocal presentation of the issues as an authoritative endorsement of its position.[8]

Webster was much clearer. In 1835, "proceed[ing] upon the admission that [the President's power to remove with-out Senate consent] does at present exist," he urged that Congress nonetheless retained the authority to "regulat[e] . . . the tenure of office." 1835 Debates 468. In his view, "no one could doubt [the] constitutional validity" of a law "de-claring that district attorneys, or collectors of customs," could be "removed [only] on conviction for misbehaviour," or even of an "unwise" law imposing a similar removal re-striction on "the Attorney General, or the Secretary of

_____

[8] Story, after all, was no enthusiast of a muscular executive removal power. See *supra*, at 16, n. 6 (detailing the "'just alarms'" raised over the prospect of such power); *infra*, at 31, 48 (similar).

State." *Id*., at 468–469. He was not alone. Henry Clay and
John C. Calhoun, often rivals to each other and to Webster,
also agreed: Clay argued at length that "the legislative au-
thority is competent to regulate the exercise of the power of
dismission" (that is, removal), *id*., at 524, and Calhoun con-
fessed that, although he had once believed the issue settled
in favor of the President's power to remove, he had changed
his mind and was "forced to conclude that the power of dis-
missing is not lodged in the President, but is subject to be
controlled and regulated by Congress," *id*., at 554–555.[9]

Far from "settled" in 1789, these continuing discussions
show that the removal issue remained an open, contested
question long after the founding. See, *e.g.*, *Hennen*, 13 Pet.,
at 259 (describing the "power of removal" as "a subject much
disputed, and upon which a great diversity of opinion was
entertained in the early history of this government").

c

Even as the President's ability to remove executive offic-
ers was the subject of spirited debate in the early republic,
limitations on Presidential removal nevertheless were en-
acted. The majority is correct that Presidents generally
"utilized their removal power" when not limited by law, see
*ante*, at 13, but the 19th-century history of Presidential re-
moval is not as absolute as the majority suggests.

To start, the First Congress itself created administrative
bodies that, although not identical to agencies like the FTC,
enjoyed significant independence in ways that undermine
the majority's simplistic history of uniform at-will removal.
For instance, in 1790 Congress enacted (and President

─────────

[9] The majority has no response regarding Clay and Calhoun, but notes
that Webster, in 1850, may have come around to the majority's view of
the Decision of 1789. See *ante*, at 13. If the majority's case depends on
the shifting views of individual Senators between 1835 and 1850, it is
unclear why Congress similarly was not free, a mere 37 years later in
1887, to change course again and impose modest limitations on the Pres-
ident's removal power like those at issue in this case. See *infra*, at 27.

Washington signed) a law creating the Sinking Fund Commission, a five-member agency responsible for stabilizing the Nation's debt.  See Act of Aug. 12, 1790, 1 Stat. 186; Chabot 172–173.  Three Cabinet Secretaries, the Vice President, and the Chief Justice headed the Commission, and the latter two could not be removed by the President—making the body at least semi-independent.[10]  It is true that the other three members were removable at will, see *ante*, at 32, but the independence of some members meant that Presidential control of the fund was not complete.  This structure did not stand alone: In 1790, Congress included the Chief Justice as a member of the Mint Board, again allowing an independent individual to carry out important Treasury functions and partake in the exercise of executive power.  See Act of Apr. 2, 1792, 1 Stat. 250.

Nor was this the only way in which the First Congress legislated to achieve agency independence.  It also established the Revolutionary War Debt Commission: a board of "three commissioners" created "to settle the accounts between the United States, and the individual states," whose decisions would be "final and conclusive" without further review.  Act of Aug. 5, 1790, ch. 38, 1 Stat. 178.  Hamilton would later describe the Commission as made up of "distinct and Independant Officers."  16 Papers of Alexander Hamilton 145 (H. Syrett ed. 1972).  The majority correctly notes that the statute did not expressly speak of removal.  See *ante*, at 31–32.  It did, however, specify that the Commissioners would "continue" in office "until the first day of July [1792]."  1 Stat. 179.  Scholarship has recently shown,

—————————

[10] The majority hypothesizes that the President, though he could not fire the Chief Justice or Vice President from their principal jobs, could remove them from their positions on the Commission.  *Ante*, at 32.  There is no evidence of this ever occurring, however; and even if it could have happened, that would have just left the Commission down a member, since the President could not add a new Vice President or Chief Justice on his own.

consistent with precedent, *infra*, at 27–28, that at the founding, such fixed-term tenures were broadly understood to preclude removal "before the end of th[e] ter[m]." Manners & Menand 5. On this understanding, the Commissioners truly were, as Hamilton claimed, independent.[11]

As the years went by, Congress continued to implement forms of tenure protection. In 1791 and then 1816, it created the First and Second Banks of the United States, the former run by directors accountable only to private stockholders and the latter with only 5 (out of 25 total) removable directors. See Act of Feb. 25, 1791, 1 Stat. 192–193 (First Bank); Act of Apr. 10, 1816, 3 Stat. 269–270 (Second Bank); see *Trump* v. *Cook*, 609 U. S. ___, ___–___, ___–___ (2026) (slip op., at 3–4, 22–23) (charting development of the Banks of the United States and emphasizing the importance of their "independence"). In 1820, it passed a law making clear that a wide swath of executive officials "shall be appointed for the term of four years, but shall be removable from office at pleasure"—with the use of "but" suggesting that the 4-year fixed-term appointment otherwise would not have permitted at-will removal. Act of May 15, 1820, ch. 102, 3 Stat. 582. In 1867, Congress enacted the Tenure of Office Act, which (most recognize today) overstepped by

———————

[11] Other executive officers, who may not have been given formal removal protections, nevertheless enjoyed forms of independence from Presidential control. JUSTICE KAGAN has explained, for example, how the Comptroller of the Treasury, also created by the First Congress, was understood to "exercis[e] independent judgment." *Seila Law*, 591 U. S., at 272. Thomas Jefferson, while President, declared that he had "'no right to interfere in the least'" with the Comptroller's activities within the Treasury, explaining that the Comptroller "'would no more receive a direction from me' than would 'one of the judges of the supreme court.'" *Ibid.*, n. 5 (quoting Letter from T. Jefferson to B. Latrobe (June 2, 1808), in Thomas Jefferson and the National Capital 429, 431 (S. Padover ed. 1946)); see also Brief for Professor Victoria Nourse et al. as *Amici Curiae* 25–36 (collecting other agencies and offices created by Presidents John Adams and Jefferson that in practice enjoyed significant independence from Presidential control).

requiring Senate consent to the removals of many officers until its repeal in 1887.  See Act of Mar. 2, 1867, ch. 154, 14 Stat. 430.  Even so, "the two-decade-long existence of the Tenure of Office Act reveals the 19th-century political system's comfort with expansive restrictions on presidential removal."  *Seila Law*, 591 U. S., at 275, n. 6 (opinion of KAGAN, J.).

Finally, in 1887, Congress created the ICC with removal protections that would later serve as the template for those of many other agencies, including the Federal Reserve and the FTC.  See *supra*, at 10–11.  For the next century and a half, that model would go on to be embraced by Congress and Presidents alike, quickly built upon, and ultimately ratified by this Court's decision in *Humphrey's*.

Against this backdrop, the majority at most can point to the paucity of many removal protections enacted during most of the 19th century.  The majority's view thus appears to be that Congress's inaction, in declining to impose provisions identical to the FTC's until 1887, forfeited its ability ever to do so in the future.  If that is how the majority sees things, then it is the majority that endorses an unsupported, use-it-or-lose-it "adverse possession" theory of constitutional powers.  *Ante*, at 24.

3

Even before *Humphrey's*, the Court's precedents likewise made clear that it is the majority's radical theory of unitary executive power, not the sustained practice of the political branches over the centuries, that is out of step with traditional notions of separation of powers in this country.

No case before the turn of the 20th century suggested that the President's removal power was not regulable by Congress.  In *Marbury* v. *Madison*, 1 Cranch 137 (1803), Chief Justice Marshall approvingly recognized that an office with a 5-year fixed-term tenure was "not removable at the will of the executive" and thus was "independent of the

executive." *Id.*, at 162, 172. That protection meant that, "having once made [a fixed-term] appointment, [the President's] power over the office [was] terminated in all cases." *Id.*, at 162. Indeed, the historic dispute in that case, over whether Marbury had been commissioned to his office as a justice of the peace, would have been academic if President Jefferson could have removed Marbury at pleasure once commissioned. It mattered only if Marbury, at that point, was safe from removal.[12]

The majority cites *Hennen*, 13 Pet. 230, which in 1839 addressed a territorial court's power to remove a clerk of that court. *Id.*, at 258. In discussing background removal principles supporting such power, *Hennen* recognized that the power to remove Presidential appointees was generally "vested in the President alone," *i.e.*, "the concurrence of the Senate" was not required. *Id.*, at 259. It also made clear, however, that the tenure of offices could vary if "limited by law." *Ibid.* A case the majority ignores, *United States* v. *Perkins*, 116 U. S. 483 (1886), held that Congress "'no doubt'" may "'limit and restrict the power of removal'" as to inferior officers and expressly left open the question whether Congress may do the same as to principal officers. *Id.*, at 484–485. The majority also cites *Parsons* v. *United States*, 167 U. S. 324 (1897), which addressed whether Congress had, in fact, granted a district attorney an unremovable tenure in office. *Id.*, at 342–343. *Parsons* carries little weight here because the Court there construed the statute at issue "to concede to the President the power of removal," *id.*, at 343, making it "unnecessary" to decide any "question of constitutional power" regarding removals, *id.*, at 335. In short, the 19th century closed with no judicial endorsement of an illimitable removal power.

───────────

[12] The majority argues that the office at issue in *Marbury* (a justice of the peace) may not have exercised executive power at all, *ante*, at 33, n. 9, but even assuming that assertion is correct, nothing in *Marbury*'s reasoning relied upon the distinctions the majority draws.

That brings us to *Myers*, authored by former-President and then-Chief Justice Taft. If *Myers* is the "best" support for the majority's position, *ante*, at 16, its theory is a castle built on sand. For one thing, as the majority admits, *Myers* did not address for-cause removal protection; the challenged statute instead required Senate consent to removal. See *ante*, at 14. Thus, despite the grand pretentions of the opinion, it decided no more than that the President could "remove a postmaster of the first class, without the advice and consent of the Senate." *Humphrey's*, 295 U. S., at 626.

Even in doing so, *Myers* managed to get a great many things wrong. Its expansive reading of Article II lacked any mooring in text or preratification history, conceding the lack of any "express provision respecting removals in the Constitution" or "discuss[ion] in the Constitutional Convention" and instead leaping to the Decision of 1789. 272 U. S., at 109–111. Further, "[m]ost contemporary scholars agree that Taft's account of the Decision of 1789 is tendentious and historically inaccurate"; in *Myers'*s own time, moreover, "scholars and jurists attacked its historical arguments." A. Katz & N. Rosenblum, Becoming the Administrator-in-Chief, 123 Colum. L. Rev. 2153, 2239, and nn. 642–643 (2023) (collecting sources). In addition, *Myers*'s claim that there was "no act of Congress . . . at variance" with its view of an illimitable removal power for the Nation's first 74 years, see 272 U. S., at 163, is at best incomplete, see *supra*, at 24–27. That is not to mention the *Myers* dissenters (Justices Holmes, Brandeis, and McReynolds), who demonstrated at great length the majority's many other errors. See 272 U. S., at 177–295.

Perhaps for those reasons, and despite the majority's contrary presentation, it is *Myers* that had little impact when it was decided and has only waned in influence since. Within a decade, and with four Justices from the *Myers* majority still on the Court, the Court in *Humphrey's* "reexamined the precedents referred to in the *Myers* case, and

f[ou]nd nothing in them to justify a conclusion contrary to" the one it reached as to the FTC. 295 U. S., at 630. The Court unanimously abandoned *Myers*'s expansive dicta, approving only "the narrow point actually decided" on the removability of postmasters "without the advice and consent of the Senate." 295 U. S., at 626. All other statements "out of harmony" with *Humphrey's* were "disapproved." *Ibid.*

For decades after that, the Court continued to cabin *Myers* to its "essence," explaining that it stands only for the proposition that "Congress [may not] 'dra[w] to itself'" the power to remove, *Morrison*, 487 U. S., at 686, and says nothing about provisions merely "limit[ing] the President's powers of removal," *Bowsher*, 478 U. S., at 724. As Justice Frankfurter put it in *Wiener*, *Myers*'s "assumption" of "the President's inherent constitutional power to remove officials, no matter what the relation of the executive to the discharge of their duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure," was "short-lived." 357 U. S., at 352. The majority is thus free to complain about the "shabby treatment" *Myers* has received, *ante*, at 34, but it has decades of precedent to blame for that, not this dissent. From *Humphrey's* to *Wiener* to *Bowsher* to *Morrison*, *Myers* had been left on the sidelines long before today, at least until the Court reinvigorated a maximalist view of Presidential power a few years ago. *Humphrey's* approval of removal protections for agencies like the FTC, to the contrary, has supplied the rule that governed the creation of the modern state over the course of the following century. See *supra*, at 6–7.

4

The majority thus has very little support in text, history, or precedent. What it does have is a theory. As the majority sees things, "the buck stops" with the President, *ante*, at 4, who holds all executive power and thus can be "'blame[d]'" or held "'responsib[le]'" for all executive conduct, *ante*, at

1–2. Yet the President cannot "execute the laws alone and unaided." *Ante*, at 4. To ensure that the President can carry out his job and remain responsible for all exercises of executive power, the majority says, his inferiors must "remain accountable to [him]." *Ibid.* The only way for that accountability to exist, according to the majority, is for "those officers [to] be removable by the President" at will, for any reason or no reason at all. *Ibid.*

Responsiveness and responsibility are certainly valuable, but they are not the only values countenanced by our Constitution. Others are the continuity and stability of Government, see, *e.g.*, The Federalist No. 77, at 458 (explaining that limitations on removal would prevent the "violent or . . . general . . . revolution in the officers of the government" at every election), and the impartiality and fair administration of justice, see, *e.g.*, 1 Annals of Cong. 612 (Madison) (arguing that some executive officials with judicial functions "ought to hold . . . office by such a tenure as will make him responsible to the public generally," not just the President). Depending on the situation, one value or another may be more or less important. Today, the majority places accountability to the President above all else.

Yet the accountability prized by the majority is not an unalloyed good. From the start, Americans distrusted the "arbitrary authority" that could result from a broad removal power, citing the "baleful influence of the royal prerogative when officers h[e]ld their commission during the pleasure of the Crown." *Id.*, at 488 (Jackson). Story saw unchecked removal authority as carrying a "monarchical and arbitrary" danger, risking the "conver[sion of] all the officers of the country into the mere tools and creatures of the president." 3 Story §1533, at 391. He also feared that unrestrained Presidential removal would "deter [those] of high and honourable minds from engaging in the public service." *Ibid.* Webster, too, observed the "obvious" risk that such a power would breed "complaisance," "indiscriminate

support of executive measures," "pliant subserviancy, and gross adulation" in place of "patriotic labors," "toils for the public good," "independence, and public spirit." 1835 Debates 459; see also *Cook*, 609 U. S., at ___ (KAVANAUGH, J., concurring) (slip op., at 2) (arguing that "political influences" can "jeopardize" administrative "efficacy").

Balancing all these concerns, and the tradeoffs they entail, has historically fallen to those who know the most about them: the political branches. This Court, on the other hand, has proven itself time and again to be the least competent branch to make these judgments. Consider just one (highly salient) example: the Court's fixation on removal. As others have explained, a "wealth of features" other than at-will removal in fact determines an agency's responsiveness to the President. *Seila Law*, 591 U. S., at 283 (opinion of KAGAN, J.); see *Free Enterprise Fund*, 561 U. S., at 524 (Breyer, J., dissenting). The President often names the Chair. See, *e.g.*, §41. He also, through the White House Office of Management and Budget, can "frequently" use the budget process to "'influence [agencies'] policies.'" *Seila Law*, 591 U. S., at 226; see also Brief for Bipartisan Former Chairs of the Federal Trade Commission as *Amici Curiae* 14–22 (discussing additional mechanisms). Even with the removal protections the Court today holds unconstitutional, the President can still remove an FTC Commissioner who fails to perform her duties adequately or commits malfeasance in office.

In sum, agencies like the FTC do enjoy some measure of independence by virtue of removal protections, but they also remain accountable in other ways. No one can seriously doubt, for instance, that the FTC's priorities shifted between the Bush, Obama, Trump, and Biden administrations. See, *e.g.*, K. Rozga & D. Gossett, Major Leadership and Policy Changes at the FTC, Davis Wright Tremaine LLP (July 14, 2021), https://www.dwt.com/insights/2021/07/biden-ftc-archive-antitrust-initiatives (archived at https:

//perma.cc/E24P-48DF) (detailing "potential sea change" and "major policy shifts" at the FTC between administrations).  There are also a variety of ways in which the President (and Congress) remain accountable for the conduct of executive officials, even without at-will removal.  See, *e.g.*, *Arthrex*, 594 U. S., at 12 (explaining that the Appointments Clause "guarantees accountability" for poorly performing officers).  In no way, then, does the FTC's structure, in purpose or effect, do away completely with Presidential influence.  Instead, Congress's design (approved by many Presidents over decades) balances that influence with other values equally cognizable under the Constitution.  The majority's rigid, inflexible rule goes badly astray by declaring one side of this balance constitutionally irrelevant.[13]

———————

[13] The Government argues, in the alternative, that even if *Humphrey's* remains enforceable, the courts still lack power to provide effective relief by reinstating Slaughter to her position.  That is incorrect.  If the Constitution permits Congress to adopt modest removal protections like the FTC's, there is no additional Article II barrier to courts enforcing them.  The Government also argues that, at common law, equitable relief like an injunction was unavailable to provide reinstatement.  That argument neglects that a "critical reason" for that rule was that "nonequitable remedies," like mandamus and declaratory relief, were available "to vindicate the rights at issue."  S. Bray, Remedies in the Officer Removal Cases, 17 J. Legal Analysis 236, and n. 2, 246, 255 (2025); see 3 W. Blackstone, Commentaries on the Laws of England 110 (1768); see also *Trump* v. *Cook*, 609 U. S. \_\_\_, \_\_\_ (2026) (slip op., at 15) (explaining that, at common law, "a court of law could settle" title to public office "by *quo warranto* or mandamus").  In any event, this Court also has long affirmed "injunction[s] requiring [an executive officer's] reinstatement."  *Vitarelli* v. *Seaton*, 359 U. S. 535, 537, 546 (1959).  The District Court here correctly found each form of relief appropriate.

Finally, the Government argues that Congress displaced any remedy here by enacting the Civil Service Reform Act (CSRA).  That is quite a claim, given that the CSRA explicitly "does not apply to" principal officers like Slaughter.  5 U. S. C. §§7511(b)(1), (3).  In any event, this novel theory is not properly before this Court, as the Government failed to raise it in any proceedings below or even in its initial application here.

### III

Nothing in the text, history, or values of the Constitution shows that *Humphrey's* was wrong or that FTC Commissioners cannot enjoy for-cause removal protection. Yet even if the majority were right about all of that, it still would not be enough to justify today's destabilizing decision.

The reason, of course, is *stare decisis*, which the majority all but disregards. Faithful "[a]dherence to precedent is a 'foundation stone of the rule of law.'" *Kisor* v. *Wilkie*, 588 U. S. 558, 586 (2019). *Stare decisis* "contributes to the actual and perceived integrity of the judicial process" by promoting "the evenhanded, predictable, and consistent development of legal principles," *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991), and ensuring that decisions are "founded in the law rather than in the proclivities of individuals," *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). At bottom, this doctrine recognizes that, even if today's Justices might decide an issue differently than their predecessors did, greater institutional values usually counsel "sticking to some wrong decisions." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 455 (2015).

Along every metric that the Court usually considers in this context, *Humphrey's* should have survived. *Humphrey's* is not wrong, let alone egregiously so. The majority hardly "even acknowledge[s] the important reliance interests that [*Humphrey's*] ha[s] generated." *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 376 (2023) (SOTOMAYOR, J., dissenting). It "discards a known, workable, and predictable standard in favor of something novel and probably far more complicated," with revolutionary consequences for our Government. *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 394 (2022) (joint opinion of Breyer, SOTOMAYOR, and KAGAN, JJ., dissenting). In the end, it is the majority's rule, not *Humphrey's*, that "short-circuit[s] the democratic process" by eliminating an option for the political branches

that has existed at least since *Humphrey's* was decided in 1935.  597 U. S., at 269 (majority opinion).

## A

Begin with a consideration the majority all but ignores: the tremendous reliance interests engendered by *Humphrey's*.  "*Stare decisis* has added force when the legislature, in the public sphere, and citizens, in the private realm, have acted in reliance upon a previous decision."  *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202 (1991).  When overruling a prior decision would "require an extensive legislative response" or "dislodge settled rights and expectations," *ibid.*, the force of *stare decisis* is "at [its] acme," *Payne*, 501 U. S., at 828.

Few cases implicate these concerns to a greater degree than *Humphrey's*.  For the better part of the last century, *Humphrey's* has guided Congress in constructing the modern system of Government, including dozens of independent agencies that remain central to protecting the Nation's economy, health, safety, and more.  At times, Congress has done so in express reliance upon the rule stated in *Humphrey's*.  Within weeks of *Humphrey's* being decided, for instance, the House amended the bill establishing the National Labor Relations Board (NLRB) to include removal protections, with the express aim of "provid[ing] that the decision of the Supreme Court in the recent *Humphreys case* shall be embodied in the statute."  H. R. Rep. No. 1147, 74th Cong., 1st Sess., 14 (1935).  Similarly, after *Myers*, Congress was reconsidering removal protections for the Federal Reserve Board of Governors.  After first being advised to await the decision in *Humphrey's*, but then assured by witnesses that *Humphrey's* "provide[d] ample legal grounds for the incorporation" of removal protections, Congress promptly reaffirmed for-cause removal protections for the Federal Reserve Governors.  Hearings on S. 1715 before the Subcommittee on Monetary Policy, Banking, and

Deposit Insurance of the Senate Committee on Banking and Currency, 74th Cong., 1st Sess., pt. 2, pp. 397, 998 (1935) (Hearings on S. 1715); see Banking Act of 1935, 49 Stat. 704–705. Although not always in terms quite so express, over the decades that followed, Congress would go on to enact dozens of laws creating similar independent agencies premised on the validity of the FTC structure that this Court blessed in *Humphrey's.* See *supra*, at 10–11.

Independence was centrally important to Congress in creating these agencies. "[I]t was essential that the[se] commission[s]" were not "open to the suspicion of partisan direction" and thus possessed the independence "necessary to the effective and fair administration of the law." *Humphrey's*, 295 U. S., at 624–625. In creating and empowering administrative agencies throughout the late-19th and 20th centuries, Congress recognized not only the need for efficient and effective regulation of the increasingly complex American economy, but also the risks of concentrating such power in the hands of the President with no check against the influence of partisan control. For the FTC, "[t]he two ideas, a commission and independence for the commission, were inextricably bound together. At no point was it proposed that a commission ought to be set up unless it be independent." R. Cushman, The Independent Regulatory Commissions 188 (1941). For the NLRB, which was patterned expressly on the FTC, "complete independence was necessary to insure complete impartiality." *Id*., at 363. In hearings considering new powers to be granted to the Federal Reserve Board, witnesses emphasized the need for "protective safeguards of the strongest character" against "'political control'" and the "danger[s]" of allowing the Federal Reserve to become "a political instrumentality of the party in power." Hearings on S. 1715, at 687, 998; see *Cook*, 609 U. S., at ___ (slip op., at 14) (explaining that "[n]ot only the *fact* of independence but also the *appearance* of independence is key to the Federal Reserve's design").

The checks the political branches devised—bipartisan membership requirements, the multimember structure, lengthy fixed terms, and for-cause removal protections—struck an essential balance in this respect. Creating these agencies under the President gave the Executive Branch the tools needed to execute the law and accomplish the modern work of Government, preserving "ample authority" for the President to ensure the "competen[t] perform[ance]" of the officers leading the agency. *Morrison*, 487 U. S., at 692. At the same time, ensuring expertise, bipartisanship, and limiting the causes of removal guarded against these new agencies becoming mere political instruments, which could be turned against political enemies with one hand and used to grant favors to allies with the other.

Indeed, without removal protections, many of the other features of these agencies' structures risk losing their force. Bipartisan-appointment requirements can easily be evaded simply by firing all Commissioners of the opposite party. Just look at the FTC today. See *supra*, at 3–4. Lengthy fixed terms, aimed at ensuring stability, continuity, and the development of expertise within an agency, can also be cut short at the President's will. Again, look at today's FTC. *Ibid.* With the most extreme exercises of at-will removal, the multimember structure itself could be eliminated, by executive fiat, with sufficient arbitrary firings to winnow a commission down to a sole remaining chair. Cf. *Cook*, 609 U. S., at ___ (opinion of KAVANAUGH, J.) (slip op., at 2) (noting the "upheaval" that could result from "[e]ven temporary uncertainty" about agency independence in the wake of such firings). The very existence of independent commissions like the FTC thus depended on (and Congress's decision to create the agencies relied upon) the premise that these agencies would exist at some remove from partisan politics and enjoy the removal protections necessary to achieve that goal.

Today's decision profoundly undermines this reliance and, as a result, undercuts one side of the balance that the political branches struck. Put simply, today the majority reshapes our Government. Dozens of independent commissions are now likely to become purely executive agencies, shifting tremendous power over broad swaths of American life into the President's hands: the Federal Energy Regulatory Commission, with responsibility for managing the Nation's energy supply, see 42 U. S. C. §7171(b)(1); the Consumer Product Safety Commission, which protects Americans against harms caused by dangerous goods, see 15 U. S. C. §2053(a); the Chemical Safety Board, tasked with investigating chemical disasters, see 42 U. S. C. §7412(r)(6)(B); the Nuclear Regulatory Commission, responsible for the regulation of nuclear power, see 42 U. S. C. §§5841(a), (c), (e); and the Merit Systems Protection Board (MSPB), charged with ensuring the integrity of the civil service, see 5 U. S. C. §1202. The list of agencies potentially modified by today's decision goes on.

Seldom, if ever, has this Court worked such a profound bait and switch on a coequal branch: For more than 90 years, Congress believed, with this Court's express approval, that it was allowed to create a workable Government, including by granting certain agencies tasked with certain responsibilities some independence from Presidential control. In rejecting that project, after decades of promising the political branches that structures like the FTC's were permissible, the Court creates an Executive Branch that Congress never dreamed of establishing and that it now has little hope of ever reining in. Cf. *Learning Resources, Inc.* v. *Trump*, 607 U. S. 229, 244–245 (2026) (opinion of ROBERTS, C. J.) (emphasizing Congress's difficulty in paring back executive power once granted, given the need for a veto-proof supermajority). The concurrence acknowledges the "real risks" implicated by the Court's abandonment of *Humphrey's. Ante*, at 13 (opinion of GORSUCH, J.).

The majority's responses fail across the board. It first asserts that congressional reliance "is relevant only in the context of severability," *ante*, at 24, n. 3, but this Court has been clear that "[s]*tare decisis* has added force when the legislature, in the public sphere, . . . ha[s] acted in reliance upon a previous decision," *Hilton*, 502 U. S., at 202; see *Payne*, 501 U. S., at 828. None of the majority's severability cases overruled any precedent, see *ante*, at 24, n. 3, and so say nothing about the role of congressional reliance in the *stare decisis* analysis. The majority also suggests that Congress's reliance interests are somehow not "'legitimate'" here because *Humphrey's* recognized congressional power at the President's expense. *Ante*, at 24. This assertion is perplexing. *Humphrey's* endorsed Congress's authority to create agencies "to carry into effect legislative policies embodied in the statute," with "independence against [the President's] will." 295 U. S., at 628–629. It was that holding on which Congress has reasonably relied. If the majority means to say that this reliance was improper because *Humphrey's* was wrong, it gets *stare decisis* backwards. The doctrine's entire point is to recognize that greater institutional values can support adhering to past decisions, even if a later majority might think them mistaken.

Finally, and equally important, the reliance interests here are not limited to Congress. Ordinary Americans and regulated firms alike have organized their affairs understanding that some Government decisions will depend not on political favoritism or partisan advantage (or at least not only on those considerations), but on expertise, adherence to law, judgment, and the public good. See, *e.g.*, *Cook*, 609 U. S., at \_\_\_ (opinion of KAVANAUGH, J.) (slip op., at 2) (arguing that uncertainty about agency independence would "risk destabilizing the U. S. economy"). America's economy works in large part due to the "stability" and predictability fostered by such expectations. *Id.*, at \_\_\_ (slip op., at 3). Today, by demanding unmediated, unmitigated

Presidential control of agency decisionmaking, the majority upends all of that. The majority responds by announcing, in short, that it knows best and that its abrupt destruction of a century and a half of precedent is broadly supportive of "'constitutionally promised liberties.'" *Ante*, at 24–25. Never mind that the elected officials representing the American people (including over a dozen Presidents) have consistently understood the people to be best served, including in their liberty interests, by agencies that are not entirely subject to Presidential whim. Because today's majority has come to believe that the American people are better off without independent agencies, it does not matter how much anyone has relied on that arrangement.

### B

### 1

The majority's assertion that *Humphrey's* has proved unworkable also blinks reality. *Ante*, at 22–23. As just shown, for over 90 years Congress has legislated, and the Government ably functioned, against the "commonly understood" rule that heads of certain multimember agencies can enjoy modest tenure protections from at-will Presidential removal. *Free Enterprise Fund* v. *Public Co. Accounting Oversight Bd.*, 537 F. 3d 667, 695 (CADC 2008) (Kavanaugh, J., dissenting). These agencies, in short, have become ubiquitous over the last century and a half.

To be sure, independent agencies are not carbon copies of one another, and there is some variation among their structures. Given the sensitive regulatory interests at stake and Congress's general flexibility in designing federal offices, that nuance should come as no surprise. By and large, however, these agencies follow a remarkably consistent pattern: multimember commissions, with a chair selected by the President, often with bipartisan membership requirements, sometimes with a background-expertise requirement, and, often, with a restriction permitting removal only

SOTOMAYOR, J., dissenting

"for cause" or for specified causes. So too do these agencies generally carry out functions like the FTC's: rulemaking, in-house adjudications, investigations, and occasional enforcement actions in court. In establishing agencies like the FTC, Congress has thus shown little difficulty applying the rule the majority today finds too murky.[14]

Nor has this Court had trouble applying *Humphrey's* over the course of the past century. It is true that, at times over those decades, disputes have arisen over the principles at play in *Humphrey's*. That is to be expected for any legal doctrine. If anything, however, those disputes have been remarkably few and far between. As to multimember commissions, this Court has returned to the issue only once, making clear that "[t]he philosophy of *Humphrey's*" plainly supported protections for members of the War Claims Commission. *Wiener*, 357 U. S., at 356. The majority claims that this paucity of cases marks a "retrea[t] from *Humphrey's*." *Ante*, at 22. The reality, however, is that the Court has seldom needed to address these issues because disputes have seldom arisen. That is so even though Congress all the while, and with minimal objection (and no vetoes) from over a dozen Presidents, has constructed the Executive Branch in reliance upon *Humphrey's* and its progeny. See *supra*, at 10–11, 35–38.

---

[14] The majority suggests that its rule is necessary because, without it, *Humphrey's* might permit Congress to turn the Environmental Protection Agency into a multimember commission with removal protections. *Ante*, at 35. *Humphrey's*, however, has been the law for nearly 100 years and this (apparently intolerable) result has not come to pass. In any event, the Constitution does not prohibit every unwise policy choice, even when it comes to structural questions. If, moreover, Congress at some point did pass a law preventing the President from "carrying out his own constitutionally assigned functions in areas like war or foreign affairs," *Seila Law*, 591 U. S., at 275, n. 6 (opinion of KAGAN, J.), nothing in *Humphrey's* would stop the Court from ensuring that the President can "accomplish his constitutional role," *Morrison*, 487 U. S., at 690.

No other decisions of this Court, as to other agency structures, suggest any inability to police the bounds established by *Humphrey's*. Contra, *ante*, at 19–20. In fact, they show the opposite. *Morrison* accepted and broadened *Humphrey's* functionalist approach, clarifying only that the exercise is not meant to "define rigid categories" of officials who exercise executive power or perform executive functions, "but to ensure that Congress does not interfere with the President's" constitutional duties. *Morrison*, 487 U. S., at 689–690. As to the officer at issue in *Morrison*, the Court held that the removal protections left the President with "ample" control. *Id.*, at 692. *Free Enterprise Fund* recognized *Humphrey's* rule, accepted it as to the Securities and Exchange Commission (SEC), and held that a second layer of protection for a subsidiary Board (a "novel structure" never considered before) was unconstitutional. 561 U. S., at 496; see *id.*, at 487. *Seila Law* also took *Humphrey's* as a given and held that a different structure (a single-director agency head) was an "almost wholly unprecedented" "historical anomaly" that fell outside *Humphrey's* scope. 591 U. S., at 217, 220–223. These conclusions were, to be sure, subject to vigorous disagreement at the time. See, *e.g.*, *id.*, at 269–296 (opinion of KAGAN, J.). Far from showing *Humphrey's* to be unworkable, however, those cases show how legal precedents work: They extend to some situations, but not to others, and Justices sometimes disagree about where to draw the lines. Whatever its outer limits, *Humphrey's* core holding as to the FTC and multimember bodies like it has never proven too difficult for courts to apply.

The majority points to a handful of recent lower court decisions from the past year or so that purportedly show that "no one knows how to apply *Humphrey's* in practice." *Ante*, at 22–23. That tumult, though, is more fairly attributed to the Court's recent emergency-docket abandonment of *Humphrey's*. See, *e.g.*, *Space Exploration Technologies Corp.* v. *NLRB*, 151 F. 4th 761, 776–777 (CA5 2025); see

also *Trump* v. *Wilcox*, 605 U. S. \_\_\_, \_\_\_ (2025) (KAGAN, J., dissenting) (slip op., at 2) (criticizing the majority for using the "emergency docket . . . to overrule or revise existing law"). When the Court fails to adhere to its own precedents in a principled manner, it is hard to expect consistency from the lower courts that must keep up with the Court's rapidly shifting views. For decades before this Court upended the doctrine, however, *Humphrey's* was a stable, easily understood precedent of this Court.

Last, the majority takes aim at *Humphrey's* use of the terms "'quasi-legislative'" and "'quasi-judicial.'" *Ante*, at 22. *Humphrey's*, however, did not draw these terms from thin air. They were "well-established term[s]-of-art," recognized by figures from Madison to Taft by the time *Humphrey's* was decided. See Brief for Legal Historian N. Rosenblum et al. as *Amici Curiae* 14; see *id.*, at 4–5, 13, 20–21. Madison, recall, recognized that even executive officers may "partak[e] strongly of the judicial character" and that such officers raise distinct considerations when it comes to removal. 1 Annals of Cong. 612. By the early-19th century, courts, too, were using the term "'quasi-judicial' to describe the duties of specialist officers whose work bore functional and procedural similarities with that of the judiciary" and the term "quasi-legislative" to refer to functions served by "'subordinate agencies'" tasked with filling in the details left open by general laws. Brief for Legal Historian N. Rosenblum et al. as *Amici Curiae* 10, 15; see *id.*, at 9–11, 15–18 (collecting cases developing these categories); see also B. Baumann & J. Shugerman, Quasi-Judicial: A History and Tradition, 127 Colum. L. Rev. (forthcoming 2026) (manuscript, at 4) (tracing the "deep historical pedigree" of independence for "quasi-judicial" officers). The majority can feign ignorance and deem these terms devoid of meaning, but it cannot change the historical record: Independence has long been associated with, and accepted as to, executive officers who carry out functions like the FTC's.

In the end, this Court has not "been forced to clarify the doctrine" in this arena "again and again." *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 409 (2024). Nor has *Humphrey's* spurred major "confusion and disagreement" in the lower courts, or "generated a long list of Circuit conflicts." *Dobbs*, 597 U. S., at 283–284. Instead, the *Humphrey's* rule is long established and has been easily applied for decades.

2

The case for retaining *Humphrey's* becomes even stronger when compared against the majority's theory, which itself promises to unleash only chaos. With remarkable steadfastness, the majority simply refuses to explain where its theory leads or where it ends. See, *e.g.*, *ante*, at 27. Although declining to consider the consequences of its decision might make it easier for the majority to cast *Humphrey's* aside, it leaves courts, agencies, and Congress with little guidance, and many new questions, on how they are supposed to assess removal questions going forward.

The majority, for example, suggests that its rule might not apply to adjudicatory agencies, including non-Article III courts like the Tax Court. See *ante*, at 28. That is welcome news, but why is it so? As the majority explains, it cannot be because such agencies are exercising judicial power. Adjudications by Executive Branch agencies "are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power.'" *Arlington* v. *FCC*, 569 U. S. 290, 305, n. 4 (2013); see *ante*, at 19. Nor, after today, is it obvious that such agencies could safely depend on a precedent like *Wiener*, which did address an adjudicatory agency but rested squarely on "[t]he philosophy of *Humphrey's*." 357 U. S., at 356. Still, the majority says, a narrow exception for non-Article III adjudicators might yet survive. If that is true, questions immediately arise: What, exactly, is the "'different set of questions'" raised by these agencies?

*Ante*, at 28. Do they depend on such entities' quasi-judicial functions? How should bodies like the MSPB or NLRB, which are mostly adjudicatory but may also possess some other functions, be treated? See, *e.g.*, Brief for Cathy Harris as *Amicus Curiae* 3 (distinguishing "legislative courts," including the MSPB, from the FTC); Brief for Gwynne Wilcox as *Amicus Curiae* 2 (similar for the NLRB). More questions, which have long been at rest under *Humphrey's*, are sure to follow.

Today's decision may also have major implications for inferior officers and civil-service employees, which the majority studiously ignores. The Court's precedents, to date, continue to support removal protections for such individuals. See, *e.g.*, *Perkins*, 116 U. S., at 484–485 (holding, in 1886, that inferior officers appointed by a department head could be protected against at-will removal). Until today, however, *Perkins* and *Humphrey's* were the "two exceptions to the President's unrestricted removal power" this Court had recognized. *Seila Law*, 591 U. S., at 204. With one of those exceptions now wiped away, the majority's silence on the other one provides cold comfort. Nor is there much in the majority's logic that supports drawing a line at principal officers. Inferior officers (and likely many employees within the civil service) wield some executive power. Regardless of their rank, if the President cannot have such individuals removed at will, then there is a break in "'the chain of dependence'" all the same (which, the majority emphasizes, must reach down all the way to the "'lowest officers'"). *Ante*, at 10. The Government, at least, has the candor not to deny that the "logic" of its position "extends to inferior officers" and, perhaps, career civil servants, too. Tr. of Oral Arg. 23–24. The majority, however, at best consigns these issues to years of future uncertainty and at worst risks the end of the employment protections that apply to members of the civil service.

Perhaps most strikingly, the Court today also makes clear that, whatever the logic of its decision, there are some ad hoc historical exceptions to its totalizing view of Article II, at least for the Federal Reserve. See *ante*, at 27–28; *Cook*, 609 U. S., at \_\_\_–\_\_\_ (slip op., at 22–23). For most agencies, the majority here says, removal protections like the FTC's make the President's job "'impossible'" and so are unlawful. *Ante*, at 2. For agencies that follow in the "lineage" of the First and Second Banks of the United States, however, the Court recognizes that the Founders were acutely aware "of the calamities that could arise from even the 'suspicion' of political manipulation of monetary policy" and that they therefore "guaranteed [such agencies] independence from Presidential control." *Cook*, 609 U. S., at \_\_\_ (slip op., at 22). As a result, the Court holds, removal protections remain permissible (perhaps even indispensable) for agencies, including the Federal Reserve, that follow in "this tradition." *Ibid.*

As discussed above, this is all partly right. Yes, the Founders did "kn[ow] from experience" that some Government functions "should not be subject to political interference." *Id.*, at \_\_\_–\_\_\_ (slip op., at 22–23); see *supra*, at 24–26. Yes, this tradition need not remain "'trapped in amber'" while Congress continues to devise new agencies and structures to "manag[e] a vastly more complex economy in a vastly more complex world." *Cook*, 609 U. S., at \_\_\_–\_\_\_ (slip op., at 22); see *supra*, at 26–27. What is unclear is why these principles should be limited only to agencies, like the Federal Reserve, that in some respects influence "monetary policy." *Ante*, at 28.

Even assuming the majority is right that the Federal Reserve's historical pedigree gives it a special place in the constitutional structure, that just leaves the majority with yet additional workability problems. How close is close enough for a historical analogue of this kind? Does any agency that "influence[s] monetary policy" qualify? *Ibid.* Is it relevant

that the modern agency, like the Bank of the United States, is "quasi-private"? *Wilcox*, 605 U. S., at \_\_\_ (slip op., at 2). What happens if Congress adds new functions beyond the historical baseline? See, *e.g.*, 12 U. S. C. §504 (granting the Federal Reserve authority to secure civil penalties of up to $1 million per day); see also A. Bamzai & A. Nielson, Article II and the Federal Reserve, 109 Cornell L. Rev. 843, 863, 887 (2024) (describing executive powers of the Federal Reserve). In short: When, exactly is our law "'trapped in amber,'" and when is it not? See *Cook*, 609 U. S., at \_\_\_ (slip op., at 22).

These line-drawing problems are the inevitable result of the majority's ruling, yet never arose under *Humphrey's*. Today, the majority replaces 90 years of proven, workable practice with a half-baked theory of executive power that is simultaneously all encompassing yet also subject to necessary but undefined exceptions. The one thing that does appear to be clear going forward is that chaos will follow.

C

Finally, the majority suggests that *Humphrey's* has been "undermined" by later cases. *Ante*, at 20, 22. That is incorrect. See *supra*, at 6–7 (collecting cases reaffirming *Humphrey's*). *Morrison* did not "'repudiat[e]'" *Humphrey's*. *Ante*, at 19. It extended its holding to uphold removal protections for a distinct, inferior officer. *Morrison*, 487 U. S., at 687–691. The case that *Morrison* repudiated was *Myers*. See 487 U. S., at 687 (rejecting "the implication of some dicta in *Myers*" that "the President's power to remove . . . was . . . 'all-inclusive'"). In *Free Enterprise Fund*, the Court accepted the lawfulness of "one level of good-cause protection" for the SEC. 561 U. S., at 484. Although *Seila Law* criticized *Humphrey's* at times, its conclusion was simply that *Humphrey's* could not resolve the distinct question at issue. 591 U. S., at 215–216, and n. 2, 229. Each of these cases left *Humphrey's* firmly in place, until today.

IV

Not two years ago, I wrote of a "disconcerting trend" in this Court's cases: "When it comes to the separation of powers, this Court tells the American public and its coordinate branches that it knows best." *SEC* v. *Jarkesy*, 603 U. S. 109, 201 (2024) (dissenting opinion). Matters that for centuries had been left to the political branches have been subordinated, one after another, to this recent Court's rigid theories of how Government should operate. See *id.*, at 201–202 (collecting cases).

The majority's decision continuing that trend today is egregiously wrong. In this case, the Court takes one of the oldest debates in American history and decides that the six Justices in the majority, alone, ought to be the ones to settle it for all time. That decision does not just overrule precedent; it all but ignores that precedent exists. It does not just hamstring the political branches' ability to respond to new challenges; it rewinds the clock nearly 150 years, holding that a common agency structure is, and always has been, forbidden. It is true that today's decision does not eliminate the FTC or the many other agencies whose structures are implicated by overruling *Humphrey's*. It is undeniable, however, that those agencies will be transformed in ways that those who created them never could have expected and actively sought to avoid, fundamentally recalibrating the balance of power in this country in the process.

Will these transformations yield the benefits, sounding in responsiveness and accountability, that the majority touts? Or will they risk placing "in the hands of a bold and designing man, of high ambition, . . . an instrument of the worst oppression," which will "sacrific[e] every principle of independence to the will of the [President]"? 3 Story §1533, at 390–392. Neither I, nor the majority, knows with certainty. That is exactly why the Constitution leaves decisions like this one, involving sensitive tradeoffs and difficult

SOTOMAYOR, J., dissenting

judgment calls, to those best positioned to make them, and then to be held accountable for doing so: the political branches.

Today, the Court discards that democratic regime in favor of one that distorts the structure of Government to fit the majority's theory of unitary, total executive control. The result is a President who emerges with far greater power than ever before. It is a power, however, that neither the People, nor Congress, nor the Constitution bestowed upon him. In granting the President this unbridled authority, the Court upends its precedent, misconstrues our history, and sheds any pretense of judicial modesty. I respectfully dissent.